## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

Disability Rights New Mexico,

      *Plaintiff*,

      v.

ALISHA TAFOYA LUCERO, in her official
capacity as Secretary of the New Mexico
Corrections Department; WENSCESLAUS
ASONGANYI, in his official capacity as Health
Services Administrator of the New Mexico
Corrections Department; and the NEW MEXICO
CORRECTIONS DEPARTMENT.

Civ. Action No. _____

      *Defendants.*

JURY DEMANDED

## <u>COMPLAINT FOR VIOLATIONS OF CIVIL RIGHTS</u>

Plaintiff Disability Rights New Mexico ("Plaintiff") brings this Complaint for Violations of Civil Rights on behalf of its constituents—individuals with disabilities who are in New Mexico Corrections Department ("NMCD") custody. Specifically, Plaintiff brings this suit on behalf of individuals with opioid use disorder ("OUD"), a recognized disability, who are being discriminated against and denied adequate medical care by Defendants. Plaintiff brings this action against NMCD Secretary Alisha Tafoya Lucero, NMCD Health Services Administrator Wensceslaus Asonganyi, and the New Mexico Corrections Department (collectively, "Defendants") for violations of its constituents' rights under the Eighth Amendment, the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, and Section 1557 of the Affordable Care Act.

## <u>INTRODUCTION</u>

Angelica[1] was only 13 years old when she started using heroin. The first time she used it was at a party after a friend pressured her to try it. That fateful night was the beginning of her addiction to opioids. Now, over 15 years later, she has lost everything important to her on account of these highly addictive drugs. At the top of the list are a relationship with her children, a chance at an education, a career in the medical field and, as she states it, "so much time."

Angelica has been in and out of prison for most of her adult life for crimes directly related to her addiction. She is currently incarcerated for the fourth time in the Western New Mexico Correctional Facility ("WNMCF") in Grants, New Mexico because of a drug-related probation violation. Prior to her incarceration at WNMCF, Angelica was incarcerated at the Bernalillo County Metropolitan Detention Center ("MDC"). There, and in the community, physicians

---

[1] Angelica is a pseudonym. This name will be used in this Complaint in place of the individual's real name to protect her privacy.

diagnosed Angelica with OUD. Physicians prescribed Angelica daily methadone, an agonist medication for opioid use disorder ("MOUD") that has proven to be the effective treatment for her OUD.[2] Agonist medications are those that activate opioid receptors in the brain to relieve withdrawal symptoms and control cravings for opioids.

OUD is a chronic, relapsing, brain disease that, similar to other chronic conditions like diabetes and high blood pressure, requires medical intervention. The disease rewires a person's brain, making it all but impossible to simply "kick the habit" of drug use. Fortunately, there exist medications that are effective at alleviating withdrawal symptoms and reducing cravings for opioids, thereby dramatically decreasing the chance of fatal overdose and increasing the chances of rehabilitation. Three FDA approved medications are used individually in MOUD treatment. These medications are methadone, buprenorphine (better known as Suboxone), and naltrexone (known as Vivitrol).

The scientific consensus is that MOUD is *the* effective treatment for OUD—it is the medical standard of care, and necessary for successful rehabilitation. For Angelica, methadone was life changing and lifesaving. Like so many living with OUD, her path to recovery has not been linear and has had its ups and downs, but methadone has proven to be the only effective medication for her on that journey. Methadone helped stabilize her, reduced her cravings for opioids, and allowed her to focus on things other than getting high. Receiving methadone at MDC helped her stay away from illegal drugs while in the facility. She was on a stable dose of methadone when sentenced to NMCD custody in late 2021.

Despite the scientific consensus that MOUD is the medical standard of care for people with OUD, Defendants maintain a de facto blanket ban on MOUD for all but pregnant people in their

---

[2] Medication for Opioid Use Disorder is also referred to as Medication for Addiction Treatment ("MAT").

custody. Because of Defendants' blanket ban on MOUD, the judge in Angelica's case remanded her to MDC to taper off her methadone for thirty days before being transported to NMCD custody. Despite this, she was abruptly transferred to NMCD custody after approximately ten days and was forced to withdraw "cold turkey" once there. The slow forced withdrawal from methadone for the first ten days while in MDC custody followed by an abrupt and total withdrawal once in NMCD custody was physically and psychologically excruciating. Angelica was forced to go through this torturous process solely because of Defendants' practice of prohibiting MOUD continuity while incarcerated. Now that she is again in NMCD custody and denied this necessary medical care, any progress Angelica had made in the past towards recovery has vanished, and she now finds herself back at square one.

Having already experienced excruciating and dangerous withdrawal, Angelica is now left incarcerated with untreated OUD. Because Angelica is not allowed access to methadone in prison, she cannot focus on her mental health, prison programming, or her recovery. Instead, she constantly craves opioids and spends most of her energy figuring out how to get through the day. Instead of working towards her recovery, she fears that upon release she will not be able to fight her cravings and will overdose and potentially die. Angelica's fear is substantiated by science. For example, one study shows that individuals leaving incarceration are a stunning 12,900% more likely than the general population to die of an overdose in the first two weeks after their release.

Angelica is only 28 years old. She has two children, ages 11 and 3 and desperately wants to stop using heroin so that upon her release, she can form a strong bond with them. She wants her grandmother, who is raising her children, to be able "to do the things that grandmas are supposed to do." She wants to stop using opioids because she doesn't want her daughter to have to bury her mother because of an overdose. Ultimately, if Angelica is to be the mother her children need—the

mother she wants to be—she needs access to the only effective treatment for her OUD. Angelica is young and has the potential to live a full, meaningful life far outside the prison walls, but that potential is cut short because of NMCD's de facto policy of denying life-saving medicine—MOUD.

Angelica's story is not unique to those incarcerated at NMCD. Millions of people in the United States and thousands of New Mexicans are diagnosed with severe opioid use disorder. The opioid epidemic is killing people in the United States at an unprecedented rate. Nationally, one person dies of an opioid overdose every seven minutes. In 2021, more than 107,000 people in the United States died of a drug overdose. This was a 25 percent increase from the previous year. Of those deaths, 75 percent involved opioids.

Even in the face of this opioid crisis, Defendants currently require anyone entering their custody on methadone or buprenorphine to forcibly withdraw from their physician prescribed, life-saving medication with no regard to the individual's medical needs. Further, not only do Defendants force people to endure dangerous withdrawal, but they place people with OUD at increased risk of relapse, overdose, and death both in prison and upon release, and fuel the undeniable drug problem inside New Mexico's prisons.

The de facto blanket ban on agonist MOUD in NMCD facilities is rooted in stigma around opioid addiction and the misconception that providing MOUD swaps one addiction for another. Defendants' practice of denying MOUD to those who have already been prescribed it by their physician for their serious medical condition is a reflection of stigma and upholds this discriminatory belief. Defendants' practice of denying MOUD to people who need it defies common sense, is condemned by the medical field, and violates the law.

Here in New Mexico, Defendants have long been aware of the magnitude and danger of the opioid crisis, the urgency of the need for MOUD treatment in their facilities, the risk to people while incarcerated and at release, and the discriminatory nature of their practice. Despite all this, they refuse to take appropriate and necessary action.

Disability Rights New Mexico ("DRNM") seeks to vindicate the rights of its constituents, like Angelica and many others in NMCD custody, who are denied their evidence-based, physician prescribed medication by Defendants. DRNM seeks declaratory and injunctive relief under the United States Constitution, the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act, and Section 1557 of the Patient Protection and Affordable Care Act ("ACA") to end Defendants' cruel and discriminatory blanket ban on medication continuity for individuals on MOUD when sentenced to NMCD custody.

## PARTIES

1.      Organizational Plaintiff Disability Rights New Mexico is a nonprofit corporation with its principal place of business in Albuquerque, New Mexico. DRNM is the agency authorized by federal statutes to pursue legal remedies on behalf of persons with disabilities. *See* 42 U.S.C. §§ 15001, *et seq.* (2000) (Developmental Disabilities Assistance and Bill of Rights Act); 29 U.S.C. § 794e (1994) (Protection and Advocacy of Individual Rights); 42 U.S.C. §§ 10801, *et seq.* (1997) (Protection and Advocacy for Mentally Ill Individuals Act). Accordingly, DRNM is authorized by law to protect and litigate the rights of individuals with disabilities, including its constituents with opioid use disorder who are incarcerated and pending incarceration.

2.      DRNM brings this lawsuit on behalf of its constituents with a disability, opioid use disorder, for which their treating physician in the community or another correctional institution has

prescribed medication for opioid use disorder, including agonists methadone and buprenorphine. DRNM has both organizational and associational standing to bring the claims herein.

3.      Defendant Alisha Tafoya Lucero is the Secretary of the New Mexico Corrections Department, in which capacity she is responsible for the housing and care of individuals in NMCD custody. Defendant Tafoya Lucero's responsibilities include setting policy and allocating resources. She is sued in her official capacity.

4.      Defendant Wenceslaus Asonganyi is the Health Service Administrator ("HSA") for NMCD's Health Services Bureau, in which capacity he is responsible for overseeing the medical services contract, is responsible for medical and mental health care, including addictions treatment of individuals in NMCD custody, and in which he participates in setting policies regarding medical care. He is sued in his official capacity.

5.      The New Mexico Corrections Department ("NMCD") is the administrative arm of the State of New Mexico responsible for administering the state's correctional facilities, where Plaintiff's constituents are or will be incarcerated. NMCD is a recipient of federal funding. NMCD is an instrumentality of the State of New Mexico. NMCD is responsible for each of the actions and inactions complained of herein and is an entity sued pursuant to the ADA, Section 504, and Section 1557 of the Affordable Care Act.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. This action seeks to vindicate rights guaranteed by the Eighth Amendment of the United States Constitution, pursuant to 42 U.S.C. § 1983.

7.      This action is also brought pursuant to Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12134, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §

794(a), and Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116.

8.     Finally, this Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, *et seq.*

9.     Venue properly lies in the Federal District Court of New Mexico pursuant to 28 U.S.C. § 1391.

## FACTS

**A.     Opioid Use Disorder Is a Deadly Medical Condition That Kills Thousands of Americans Each Year but Is Treatable with Medications.**

10.     Opioids are a class of drugs that inhibit pain and have euphoric effects.

11.     Some opioids, like oxycodone, have widely accepted medical uses, like pain management. Others, such as heroin, are illegal and not used in medicine in the United States.

12.     All opioids are highly addictive.

13.     Opioid use disorder is a chronic, relapsing brain disorder that can have deadly consequences.

14.     OUD is characterized by compulsive use of opioids despite negative consequences. Signs of the disorder include uncontrollable cravings for and compulsive use of opioids, decreased sensitivity to opioids, and potentially excruciating withdrawal symptoms when not using opioids.

15.     OUD is a progressive disease, meaning it gets worse over time.

16.     Without effective treatment, patients with OUD are rarely able to control their use of opioids, often resulting in serious physical harm or premature death, including death due to accidental overdose.

17.     OUD breaks down the dopamine system necessary for the brain to feel a sense of normalcy and confidence in its own survival. People who are dopamine deficient have difficulty enjoying life activities and feeling normal, and they experience feelings of depression, anxiety, and

irritability.

18.     OUD rewires the brain for addiction. Brains that are addicted to opioids produce less than half the dopamine of non-addicted brains.

19.     People with OUD cannot simply "will" or "reason" their way out of continued opioid use, even when they are aware of the dire consequences and fervently desire to be free from the addiction.

20.     Continued use of opioids does not indicate that a person lacks willpower, but rather is the predictable outcome of chemical changes in the brain that result in uncontrollable cravings.

21.     Opioid addiction has thus proven especially unresponsive to non-medication- based treatment methods, such as abstinence-only and 12-step programs, which have been popular in treating other addictions such as alcoholism.

22.     Like other chronic diseases, OUD often involves cycles of relapse and remission. Rather than a linear progression in which a person attains abstinence from opioid use once-and-for-all, "successful" recovery for OUD is often characterized by sustained periods of abstinence or "active recovery," punctuated by relapses in which the person returns to drug use.

23.     These relapses are frequently triggered by an increase in life stressors, a traumatic event, or a lapse in treatment, which causes the person to turn toward illicit drug use.

24.     The typical treatment goal for OUD is thus to maximize periods of active recovery and minimize periods of relapse by ensuring continued treatment and encouraging the use of coping mechanisms and support systems.

25.     As a chronic condition, OUD is often incurable but can be controlled with the use of chronic medication and psychological supports.

26.     In essence, OUD can be treated like other incurable but controllable medical

conditions, such as diabetes and high blood pressure.

27.     As with other chronic conditions, discontinuation of medication almost always results in the return of symptoms.

28.     Opioid addiction is at a crisis level nationally and is even more pronounced in New Mexico.

29.     The opioid epidemic is killing people in the United States at an unprecedented rate. Nationally, one person dies of an opioid overdose every seven minutes. Over 150 people die every day from overdoses related to synthetic opioids like fentanyl.

30.     The Center for Disease Control ("CDC") reports that since the COVID-19 pandemic, the rate of opioid overdose deaths has accelerated.

31.     Millions of Americans and thousands of New Mexicans are diagnosed with severe opioid use disorder.

32.     In 2019, 74 percent of drug overdose deaths in New Mexico involved opioids.

33.     In 2020, the CDC reported over 100,000 drug-related deaths.

34.     In 2020, there were 801 fatalities due to a drug overdose in New Mexico.

35.     That year, New Mexico had the 11th-highest drug overdose death rate in the United States. The majority of these overdose deaths were attributed to opioids.

36.     In the last ten years, the proliferation of fentanyl and other synthetic opioids—an extremely dangerous class of drug—has driven the sharp rise in opioid deaths nationally. The CDC estimates that deaths from fentanyl and other synthetic opioids rose 56 percent from 2019 to 2020 alone.

37.     Fentanyl is up to 50 times stronger than heroin and 100 times stronger than morphine.

38.     As demonstrated by the United States Drug Enforcement Administration ("DEA") image of a lethal dose of fentanyl below, a tiny amount of fentanyl can be deadly.



39.     Heroin and other illegal opioids are now commonly laced with fentanyl—often without the knowledge of the person using the opioids.

40.     As a result, people with OUD who use illegal opioids now face a heightened risk of being unwittingly exposed to lethal doses of fentanyl.

41.     The science is clear: *The* effective treatment for this insidious disease is medication for opioid use disorder ("MOUD"). Broad consensus in the medical community confirms agonist MOUD, such as methadone and buprenorphine, is the standard of care and necessary to treat opioid addiction.

42.     Other treatments—or no treatment at all—are perilous by comparison, as robust clinical data show.

**B.      Incarcerated People with OUD Are at Heightened Risk of Serious Harm Related to Their Addiction.**

43.     Opioid use disorder is more prevalent among incarcerated people than in the general population.

44.     According to the National Academy of Sciences, approximately 15 percent of

11

people incarcerated in jails and prisons in the United States have OUD.

45.     Incarcerated individuals with OUD are at significant risk of overdose and other addiction-related complications both during and immediately following their incarceration.

46.     Drug overdose is a leading cause of death among formerly incarcerated people.

47.     As well, opioids and other drugs are readily available in jails and prisons.

48.     According to the Substance Abuse and Mental Health Services Administration ("SAMHSA"), 19 percent of people incarcerated in state prisons report regular opioid use.

49.     On July 27, 2022, Defendant Asonganyi testified before the New Mexico Legislature's Courts Corrections and Justice ("CCJ") interim committee about the impact of illicit drug use in New Mexico's prisons.[3]

50.     As part of that testimony, Defendant Asonganyi and another representative of NMCD informed the committee that from July 2021 to December 2021 there had been 188 serious drug-related medical incidents in NMCD facilities.

51.     He further testified that opioids are the most commonly used drugs in prisons.

52.     Defendant Asonganyi testified that drug use in prisons interferes with incarcerated individuals' ability to participate fully in programming and leads to behavioral issues within the prison.

53.     Defendant Asonganyi also explained that while overdose deaths are a serious problem, opioid use in prisons also exacerbates other underlying health conditions that many incarcerated people have and puts them at risk for other injuries and diseases such as cancer and

---

[3] *Update on the Corrections Department*, presented to New Mexico Legislature's Courts Corrections and Justice Interim Committee (July 27, 2022), *available at* https://sg001-harmony.sliq.net/00293/Harmony/en/PowerBrowser/PowerBrowserV2/20220728/-1/69044?startposition=20220727093554&mediaEndTime=20220727095717&viewMode=3&globalStreamId=3.

liver disease.

54.     He further testified that secondary consequences from overdoses and drug use, such as heart problems and infections, result in more frequent transports of incarcerated people to outside hospitals.

55.     The dangerous circumstances in which incarcerated people use illicit drugs can and do result in overdoses, overdose deaths, transmission of blood borne diseases including HIV, Hepatitis B and C, heart valve infections, and soft tissue infections that can be extremely serious and even life-threatening.

56.     From 2001 to 2018, the number of people in the United States who died in state prisons from drug or alcohol intoxication increased by more than 600 percent.

57.     In addition to the risks facing incarcerated people with OUD, the risk of overdose deaths for individuals with OUD after their release from correctional facilities is huge. One study found that incarcerated people are 12,900 percent more likely than the general public to die of a drug overdose in the two weeks immediately following release.

58.     This is in part because most people with OUD lose their increased tolerance to opioids while incarcerated and thus are at higher risk of overdose in the weeks post-release.

59.     Defendants are aware of the risk of overdose to individuals returning to the community from incarceration, as evinced by their own policies.

60.     The risk of overdose for incarcerated individuals being released to the community is so widely known and accepted that Defendants are required by statute and NMCD policy "to provide two doses of naloxone to every NMCD inmate who is discharging or releasing from an NMCD facility."

61.     Naloxone (sold under the brand name Narcan) is a drug that if administered in time can, can reverse opioid overdoses.

62.     Narcan is not a medication that treats OUD. It treats opioid overdoses and is not a substitute for MOUD.

63.     While this harm reduction step is important, it is akin to denying people blood pressure medication, and then discharging them from prison with a defibrillator.

64.     Defendants provide a substance use disorder and overdose prevention/Narcan training to their staff.

65.     Defendants' own staff training highlights the dangers of opioids for incarcerated people.

66.     For example, the training specifically states that "[a]n estimated two-thirds of American prisoners have misused opioids and/or have an opioid use disorder."[4]

67.     It further states that "[t]wo weeks post-release: opioid overdose death Risk is **40 times higher** among released inmates than the general public" and "heroin overdose death risk is 74 times higher among released inmates than the general public." *Id*. (emphasis original).

68.     The NMCD training also states that even "1 year post-release" inmates have "up to **18 times** higher risk [of] opioid overdose risk than the general public." *Id*. (emphasis original).

69.     Defendants own training also states that "[i]ncarceration without treatment for OUD results in increased risk for fatal overdose in the weeks following release, as compared to people who receive MOUD while incarcerated." *Id*.

70.     Despite training their staff on the importance of MOUD, Defendants still require people entering their facilities who are current on their physician prescribed MOUD to discontinue their life-saving treatment.

---

[4] *Substance Use Disorder (SUD)/Overdose Prevention Training & Narcan Treatment* PowerPoint, New Mexico Corrections Department Health Services Bureau, received by Plaintiff's Counsel on Sept. 15, 2022 in response to New Mexico Inspection of Records Act request to NMCD.

14

71.     In July, Defendant Asonganyi told the CCJ committee that "any effort to curb that trend [of drug-related medical incidents] is very much welcome."[5]

72.     He told the committee that "it is quite disturbing when on a weekly basis you get numbers of suspected overdose cases within the prison system across the state and all [] you have as a plan is that I will either take them to the hospital or provide first aid. Yes, you do that, but you know for sure that that's not sustainable, and that's not good care."

73.     Yet Defendants do not provide continuity of the only effective medical care for OUD–MOUD–to those entering NMCD custody. Instead, people are forced to withdraw from their physician prescribed medication, placing them at unreasonable risk of harm.

74.     Finally, opioid use disorder also contributes to recidivism rates.

75.     In New Mexico, approximately *one-third* of prison admissions are due to technical parole and probation violations, many based on failed drug tests and missed appointments.

76.     A 2019 study by the New Mexico Legislative Finance Committee "found that 67 percent of parolees violate conditions at least once" and 75 percent of those violations "are for failed drug tests or missed appointments."

77.     Despite all of this, Defendants do not allow people to continue their physician prescribed MOUD in their facilities.

**C.      MOUD Is the Standard of Care for Opioid Use Disorder.**

78.     A "standard of care" is a medicolegal term that signifies the proper treatment for a certain type of disease or medical condition.

79.     Medication   for   opioid   use   disorder,   specifically   agonists   methadone   and

---

[5] *Update on the Corrections Department*, presented to New Mexico Legislature's Courts Corrections and Justice Interim Committee (July 27, 2022), *available at* https://sg001-harmony.sliq.net/00293/Harmony/en/PowerBrowser/PowerBrowserV2/20220728/-1/69044?startposition=20220727093554&mediaEndTime=20220727095717&viewMode=3&globalStreamId=3.

buprenorphine, is the standard of care treatment for opioid use disorder.

80.     The scientific consensus is clear: MOUD is the only effective treatment for OUD.

81.     Although they can be a helpful component of effective treatment for OUD, therapy and counseling alone do not have high success rates.

82.     Treatment with MOUD uses one of three Food and Drug Administration ("FDA") approved medications to treat OUD: methadone, buprenorphine (often sold under the brand name Suboxone),[6] and naltrexone (sold under the brand name Vivitrol).

83.     The World Health Organization ("WHO") has categorized methadone and buprenorphine as "essential medications."

84.     The American Medical Association, the American Society of Addiction Medicine, the U.S. Department of Health and Human Services, the FDA, the National Institute on Drug Abuse, the Office of National Drug Control Policy, and SAMHSA have all endorsed the necessity of MOUD.

85.     The National Institute of Drug Abuse ("NIDA") explains that MOUD decreases opioid use, opioid-related overdose deaths, criminal activity, and infectious disease transmission.

86.     Not all MOUD medications are equally effective for every patient.

87.     Studies show that only two—methadone and buprenorphine—produce longer-term "treatment retention," which is the key to effective MOUD treatment.

88.     Addiction treatment doctors note that "[c]linical evidence consistently shows that when patients discontinue or are taken off of MAT for OUD, relapse rates soar and are associated with increased lethal opioid overdose. For this reason, patients should be encouraged to continue their MAT for as long as possible, including indefinitely."

_____

[6] Suboxone is an agonist that contains buprenorphine and naltrexone. Subutex is another brand name that only contains buprenorphine.

89.     Methadone and buprenorphine are "agonists," which means they activate opioid receptors in the brain to relieve withdrawal symptoms and control cravings. Methadone is a "full agonist," meaning that it fully activates opioid receptors. Buprenorphine is a "partial agonist," meaning that it partially activates opioid receptors.

90.     Because methadone and buprenorphine bind to the opioid receptors they stimulate, they block the receptors from being stimulated by more powerful opioids (like heroin or fentanyl) and return patients back to a steady state where they can feel normal and go about their daily lives.

91.     The effects of both methadone and buprenorphine are much milder, steadier, and longer-lasting than drugs such as heroin, fentanyl, or oxycodone.

92.     Thus, MOUD trains patients' brains to gradually decrease their response to and interest in opioids.

93.     In contrast to methadone and buprenorphine, naltrexone is an "antagonist."

94.     It is considered a sub-par treatment by many addiction treatment physicians as it is effective for very few patients.

95.     Unlike methadone and buprenorphine, evidence has not established that naltrexone reduces overdose deaths.

96.     Because naltrexone requires full withdrawal from opioids prior to induction, (including opioid agonists methadone and buprenorphine), it is difficult for individuals to successfully start naltrexone treatment.

97.     It is particularly inappropriate and dangerous to forcibly change a patient successfully using an agonist medication, such as methadone or buprenorphine, to an antagonist, such as naltrexone, because doing so subjects the patient to severe and agonizing withdrawal.

98.     Many people, even in an inpatient setting, are not successful in being started on

17

naltrexone due to the need to first endure a physically and psychologically painful withdrawal from either their prescription agonists (buprenorphine or methadone) or illicit opioids.

99.     Naltrexone does not relieve withdrawal symptoms, and in fact can trigger acute and severe withdrawal if administered before a patient's system has fully discharged opioids, which can take between seven and ten days.

100.     In addition, because naltrexone has worse outcomes in terms of treatment retention (i.e. the length of time clients remain in treatment) compared to methadone or buprenorphine, switching someone onto naltrexone would place the patient at increased risk of relapse, overdose, and death.

101.     Treatment retention is key for recovery.

102.     Because physiological tolerance to opioids is reduced when a patient is on naltrexone, individuals who have been forced to withdraw involuntarily from other MOUD have a significant increased risk of overdose death if they discontinue naltrexone treatment upon release and proceed to use opioids. This is not the case for individuals who remain on methadone or buprenorphine.

103.     SAMHSA explains that "[b]lanket prohibitions against MAT or against certain medications, such as methadone or buprenorphine, are medically unjustified and potentially harmful."

104.     Discontinuing an individual's MOUD without their consent and without medical necessity violates the medical standard of care.

105.     Requiring incarcerated individuals to discontinue or change a medication that has been successful for them leads to poor outcomes and a lower likelihood of continuing MOUD treatment after release. These "poor outcomes" include increased risk of overdose and death.

106.     The National Commission on Correctional Health Care ("NCCHC"), which establishes standards for health services in correctional facilities and operates a voluntary accreditation program for institutions that meet their standards, recommends that carceral facilities use MOUD to treat opioid addiction.

107.     In doing so, the NCCHC has made clear that "the specific medication chosen, should be the individual's [decision] after consultation with medical and treatment providers, not imposed by a justice or treatment agency."

108.     This is because, as with any medication, individual patients have individual responses—one medication may work better than the other for a particular person.

109.     MOUD and continuity of MOUD is the evidenced-based standard of care for OUD.

**D.      Defendants' Practice of Denying MOUD Continuity Violates the Standard of Care and the Law and Causes Needless Suffering.**

110.     Organizations and agencies nationally and locally have called on corrections departments to provide MOUD.

111.     Given the serious risks that OUD poses for incarcerated people, it is no surprise that an array of governmental authorities and medical and professional associations require or recommend that jails and prisons provide maintenance MOUD to those in their custody.

112.     In recent years, the U.S. Department of Justice ("DOJ") has consistently taken the position that, under the Americans with Disabilities Act ("ADA"), access to MOUD is required in both carceral settings and court programs. The DOJ has repeatedly confirmed that MOUD is the standard of care for treatment of OUD and that denying access to MOUD can constitute unlawful disability discrimination.

113.     In 2017, the DOJ Civil Rights Division launched the Opioid Initiative to enforce the ADA and work with the U.S. Attorneys' Offices nationwide to "ensure that people who have

completed, or are participating in, treatment for OUD do not face unnecessary and discriminatory barriers to recovery."

114.    In April 2022, the DOJ's Civil Rights Division issued guidance on how the ADA protects people suffering from OUD.

115.    The DOJ instructed that "[p]eople with OUD typically have a disability because they have a drug addiction that substantially limits one or more of their major life activities" and that the ADA protects those with disabilities from "discrimination by…prisons and jails."

116.    The DOJ provided examples of ADA violations, including a jail that does not allow "incoming inmates to continue taking MOUD prescribed before their incarceration," and is considered to have a "blanket policy prohibiting the use of MOUD."

117.    The DOJ's position is that policies and practices prohibiting MOUD for incarcerated individuals violates the ADA.

118.    The provision of MOUD to individuals in state and local custody is recommended and encouraged by the major correctional health associations and medical associations concerned with addiction medicine.

119.    In 2021, the New Mexico Department of Health Overdose Prevention Section, Behavioral Health Services Division, and the New Mexico Behavioral Health Collaborative conducted a "Overdose Fatality Review (OFR) Reentry Pilot project." This project reviewed the deaths of people who died of overdoses after release from incarceration and made recommendations based on this review.

120.     NMCD's Behavioral Health Bureau Chief, Dr. Wendy Price, participated in the OFR.

121.    The OFR issued a final report in January 2022.

122.    The top recommendation included in the report is to "provide access to MOUD/MAT to incarcerated adults."

123.    Nevertheless, Defendants have adopted a policy and practice of denying inmates with disabilities access to appropriate treatments.

124.    This policy and practice further fails to allow for the determination of whether, on an individualized basis, individuals with OUD who require MOUD should be prescribed methadone or buprenorphine as a reasonable accommodation.

125.    In August, Defendants revised an internal NMCD policy (CD-170103) titled "Procedure: Intoxication, Withdrawal, Detoxification, and Substance Use Disorder Treatment."

126.    While the revision purports—for the first time—to now have an MOUD program in place, upon information in belief, Defendants current practice continues to deny people with OUD who are on methadone or suboxone their medications.

127.    On September 10, 2022, over a month after the revised policy was issued, Carmelina Hart, spokesperson for New Mexico Corrections Department, confirmed in the Albuquerque Journal that "no prisons in the state offer MAT[/MOUD] for substance use, except in the case of pregnant inmates."

128.    On September 20, 2022, DRNM contacted Defendant Tafoya Lucero via email and certified mail with a "Request for Information about MOUD in NMCD and Notification of Potential Litigation." DRNM provided information about the standard of care and the state of the law and explained that by denying MOUD to people in its custody, NMCD was discriminating against people with OUD, causing suffering, placing them at serious risk of harm, and being deliberately indifferent to their serious medical needs.

129.    DRNM explained that it understood that NMCD did not provide MOUD to anyone

in its custody except for pregnant people, and it welcomed the opportunity to have this understanding of NMCD's practices corrected. DRNM stated that it was open to working collaboratively in a reasonable timeframe to ensure that people's MOUD is not disrupted, but that it was also poised to initiate litigation.

130.    DRNM asked for a response from NMCD by October 3, 2022. Defendants never responded.

131.    Upon information and belief, NMCD does not provide MOUD continuity to anyone entering their facilities except some pregnant people, and even then only up until the birth of the child.

132.    Defendants put these individuals through forced, sudden withdrawal in a process they refer to as "detoxification."

133.    The physical and psychological symptoms of withdrawal from MOUD are crushing. They include bone and joint aches, nausea, vomiting, diarrhea, fever, excessive sweating, hypothermia, hypertension, tachycardia, depression, anxiety, dysphoria, insomnia, and frequently suicidal ideation. These symptoms can last for weeks or months and can lead to life-threatening complications—even apart from the risk of relapse and overdose—including pneumonia and fatal dehydration.

134.     Efforts to "medically manage" forced withdrawal or "detoxify" patients, with non-MOUD medications or otherwise, are not effective.

135.     Medically managed withdrawal does not treat the chronic condition: OUD.

136.    To the contrary, as SAMSHA confirms, patients who complete medically supervised withdrawal are at a risk of opioid overdose.

137.    For example, one study of treatment outcomes from a detoxification facility showed

a 29 percent relapse rate on the day of discharge, a 60 percent relapse rate after one month, and a success rate of between only 5 percent and 10 percent after one year.

138.   DRNM has spoken with constituents with OUD who were forced to withdraw from their prescription MOUD upon being sentenced to NMCD custody. Those whose dose was reduced milligram by milligram while remanded to the county jail post-sentencing describe the agony of slowly experiencing stronger and stronger cravings for opioids. They describe increased physical symptoms by the day as their dose of MOUD was reduced, feeling the withdrawal in their bones, and experiencing the desire to self-harm and the pain of suicidal thoughts.

139.   Others who were forced to withdrawal "cold turkey" upon intake at NMCD describe the intense physical symptoms within hours or days of the last dose of their prescription medication. They all had other underlying mental illness diagnoses and discussed the increased psychological pain of knowing that this suffering was unnecessary and avoidable. They also discussed their fears of relapsing, overdosing, and dying.

140.   DRNM has spoken with constituents who have loved ones with untreated OUD who have overdosed and died upon release from incarceration.

141.   DRNM has spoken with constituents who provide a firsthand account of the prevalence of illicit drugs in Defendants' prisons and the dangers these drugs pose.

142.   Defendants do allow for continuity of physician-prescribed MOUD, including agonist MOUD, to individuals with OUD.

143.   To the extent Defendants have a policy regarding the provision of MOUD, Defendants do not abide by that policy.

144.   Defendants currently deny all but pregnant people access to MOUD regardless of the individual's current medication status and individual medical need.

145.     Defendants know that a high percentage of people incarcerated in NMCD facilities have OUD, that there are people sentenced to NMCD current on physician prescribed MOUD, that discontinuing MOUD is contrary to the standard of care, that discontinuing MOUD increases the risk of relapse overdose and death, as well as the risk of other morbidities, and that there is widespread illicit opioid drug use in Defendants' prisons.

146.     Defendants have been presented with policy analysis, advice of physicians, studies, and law informing them that the provision of MOUD to incarcerated people is medically and legally necessary.

147.     Defendants are aware that failing to provide MOUD continuity to people with OUD places them at an increased risk of overdose while in custody and upon release and that failing to do so violates the standard of care, the Eighth Amendment, the ADA, and other federal laws.

E.     **Administration of MOUD Is Essential, Safe, and Feasible in New Mexico Corrections Department Facilities**

148.     The provision of MOUD in prisons is safe, feasible, and recommended by entities such as the DOJ, the American Correctional Association, and the National Commission on Correctional Health Care ("NCCHC").

149.     The NCCHC, in collaboration with the National Sheriffs' Association, published guidelines for the provision of MOUD in correctional facilities. In recommending expanded access to MOUD in jails, including methadone, the NCCHC and the National Sheriffs' Association emphasized that such access can "[c]ontribut[e] to the maintenance of a safe and secure facility for inmates and staff" and reduce disciplinary problems and recidivism, in addition to withdrawal symptoms, and the risk of post-release overdose and death.

150.     The American Correctional Association (which creates national standards and accredits prisons across the country), and the American Society of Addiction Treatment Medicine

issued a "Joint Public Correctional Policy on the Treatment of Opioid Use Disorders for Justice Involved Individuals," supporting the use of MOUD in correctional settings.

151.    Successful programs providing MOUD in prisons and jails across the country provide illustrations of how feasible and life-saving such programs are.

152.    For example, in 2015, the Middlesex Sheriff's Office in Massachusetts launched a successful Medication-Assisted Treatment and Directed Opioid Recovery (MATADOR) program that provides comprehensive care to individuals at many steps in their recovery. In the three years after implementing the program, 81 percent of the individuals who completed the program were not rearrested for new crimes.

153.    In 2016, the Rhode Island Department of Corrections launched a treatment program for opioid use disorder providing MOUD to all those who need it. The program resulted in a 60 percent decrease in post-incarceration deaths the year after the program was implemented, which contributed to a 12 percent decrease in the state's overall overdose deaths.

154.    In November 2019, the federal Bureau of Prisons issued guidance requiring that all of its facilities provide continuity of MOUD to people in their custody if it is clinically appropriate.

155.    An April 2022 report from the California Department of Corrections shows that following the implementation of a substance use disorder treatment program including MOUD in California prisons, overdose deaths decreased by 58 percent.

156.    Finally, MDC provides a local example of a successful MOUD program for in-custody individuals.

157.    MDC is the largest correctional institution in New Mexico, housing more people on a given day than Defendants' largest prison. MDC has provided methadone continuity to incarcerated people since 2006.

158.    MDC currently provides methadone and buprenorphine continuity to people who were on those medications prior to their incarceration *and* starts people with OUD on these agonist MOUD treatments.

159.    One of the few limitations of the MDC program is that a person will not be continued or started on MOUD if they are likely going to be transferred to an NMCD facility within a short timeframe because NMCD does not have an MOUD program.

160.    In the years since MDC began providing MOUD, national consensus has only grown as to the importance of this treatment.

161.    For example, here in New Mexico, the New Mexico Behavioral Health Collaborative[7] has identified MOUD in correctional settings as a "gap" in comprehensive OUD prevention and treatment for the state, making it an "important priority" moving forward.

162.    In November of 2020, the Governor's Council on Racial Justice's Health Subcommittee recommended that all NMCD facilities screen all inmates for OUD, offer all three MOUD medications, and begin services within 24 hours of an incarcerated person's arrival.

163.    Defendants already ensure that at least one prison has an agonist MOUD (specifically, buprenorphine) available on-site *at all times*. Defendants' "High risk Pregnancy Procedure" *requires* this at WNMCF women's prison where pregnant inmates are held.[8]  The fact that NMCD provides MOUD (in the form of buprenorphine) to some individuals demonstrates that the provision of MOUD is not only feasible, but already a part of NMCD's medical care infrastructure.

---

[7] The Behavioral Health Collaborative ("BHC") was created in the 2004 Legislative Session to allow several agencies to utilize resources across state government to work together to improve mental health and substance abuse services in New Mexico. Defendant Tafoya Lucero and her agents have participated in BHC meetings where they have confirmed the lack of MOUD treatment within NMCD.

[8] It is important to note that women incarcerated by NMCD who are on buprenorphine while pregnant are forced to withdraw from the medicine after delivery of their baby.

164.     While methadone is more regulated than buprenorphine and for OUD treatment purposes can only be dispensed by an opioid treatment program ("OTP"), patients can receive take-home doses.

165.     In New York, where the corrections system is mandated by law to provide MOUD, prisons have worked with OTPs to have methadone delivered and to qualify those who handle it as agents of the OTP.

166.     The United States Department of Justice has found that failing to provide continuity of these agonist MOUD treatments violates the ADA. Despite this, Defendants continue to deny people medication continuity, forcing them to endure tortuous withdrawal and then to live in Defendants' custody with untreated OUD, subjecting them to relapse, overdose, and potential death.

**F.     Defendants' Policy of Forced Withdrawal and Their Refusal to Provide MOUD to Individuals in NMCD Custody Is Discriminatory and Based on Stigma.**

167.     Individuals in NMCD custody depend on NMCD to provide all medical care, including medical care for OUD.

168.     Accordingly, constituents of DRNM who are in the custody of NMCD are entitled to adequate medical care while in custody.

169.     Irrespective of an incarcerated person's drug use, MOUD is a health service and a service provided in connection with drug rehabilitation, which is protected under the ADA.[9]

170.     In practice, NMCD categorically and arbitrarily denies all non-pregnant people with OUD (a qualifying disability) in its custody access to MOUD, including access to continuity of agonist MOUD treatment for those who had been prescribed this essential medication prior to being

---

[9] *See* 42 U.S.C. § 12210(c) ("an individual shall not be denied health services, or services provided in connection with drug rehabilitation, on the basis of the current illegal use of drugs if the individual is otherwise entitled to such services").

sentenced to NMCD.

171.    This denial consistent with entrenched stigma towards OUD generally and MOUD specifically, which leads to the obstruction of access to these life-saving medications.

172.    This stigma is grounded in longstanding and deeply rooted misconceptions that OUD is a choice and a moral failing.

173.    A nationwide poll found that 78 percent of Americans believe that people who are addicted to prescription opioids are themselves to blame, and that 72 percent believed people addicted to prescription opioids lack self-discipline.

174.    These misconceptions persist even though OUD is a medical condition that permanently rewires the brain and renders it chemically dependent on opioids—a condition that millions of Americans of all backgrounds live with.

175.    Research confirms that stigma towards OUD is a formidable barrier to patients' accessing necessary treatment.

176.    As a group of experts representing medical institutions across the country recently lamented, the "undertreatment of people with OUDs who . . . have a history of involvement with the criminal justice system, often motivated by stigma, represents a missed public health opportunity given the well-established effectiveness of opioid agonist treatment."

177.    Because "stigma is a barrier to implementation of evidence-based policies and program to address the opioid crisis," medical and governmental authorities have identified combatting stigma as key to improving health outcomes for people with opioid addiction and, ultimately, to ending the opioid epidemic.

178.    Both the United States Department of Health and Human Services and the American Medical Association's Opioid Task Force have identified countering stigma as integral to

addressing the opioid crisis.

179.    The National Institutes of Health has funded clinical interventions seeking to reduce the effect of stigma on care delivery to people with OUD.

180.    Former FDA Commissioner Dr. Scott Gottlieb underscored that the urgent work of "expand[ing] access to high-quality, effective medication-assisted treatments" to patients with OUD must include "countering the unfortunate stigma that's sometimes associated with their use."

181.    Defendants' denial of access to MOUD continuity is consistent with entrenched bias against agonist MOUD, and the stigmatizing idea that providing agonist MOUD is the same as giving drugs to drug addicts—rather than treating someone with OUD medically.

182.    Accordingly, the decision to prohibit access to continuity of MOUD is discriminatory in violation of the ADA.

G.    **Defendants' Discriminatory Denial of MOUD to Individuals in NMCD Custody Is Harming Plaintiff's Constituents and Violates the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.**

183.    DRNM has been designated by the State of New Mexico to receive federal funds for advocacy activities pursuant to the Developmental Disabilities Bill of Rights Act ("DD Act"), 42 U.S.C. §§ 15041 et seq, the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI") 42 U.S.C. § 10801 et seq., and the Protection and Advocacy for Individual Rights Act ("PAIR") 29 U.S.C. § 794e (collectively, "the P&A Acts").

184.    DRNM is governed by a board of directors comprised predominantly of people with disabilities and their family members, and this board is advised by a PAIMI Advisory Council.

185.    DRNM's board of directors and DRNM's PAIMI Advisory Council develop annual priorities and objectives of the P&A System.

186.    DRNM's published priorities include pursuing serious civil rights violation

litigation where there is a clear opportunity to improve the practices of a provider or public service agency; to assist and advocate for individuals in need of mental health services in cases where services are delayed, denied, or significantly reduced, or where the amount, duration, or scope of services offered is clearly inadequate, and where there is serious risk to the individual's health or safety, or a serious risk of hospitalization; and in such cases, to pursue systemic remedies as appropriate.

187.    DRNM is sufficiently identified with its constituents and subject to their influence, which is demonstrated by DRNM's actions after receiving reports of individuals with OUD incarcerated within NMCD who are or have been denied access to MOUD.

188.    Prior to filing this action, DRNM received numerous reports of constituents being denied MOUD continuity from undersigned counsel to this case and reports from attorneys with the New Mexico Law Offices of the Public Defender.

189.    DRNM has interviewed constituents currently and formerly incarcerated within NMCD who have been diagnosed with OUD, who were prescribed agonist MOUD prior to their incarceration, and who were forced to withdraw due to being sentenced to NMCD.

190.    DRNM has allocated its limited resources, at cost to DRNM, to investigate this case, conduct legal research, consult with partners and stakeholders, seek in good faith to collaborate with NMCD to remedy its legal violations, and ultimately file this lawsuit after NMCD declined to collaborate.

191.    With respect to the causes of action stated in this Complaint, numerous constituents of DRNM have standing to sue in their own right.

192.    The interests of DRNM constituents in accessing standard of care treatment for OUD in state prisons and for such constituents to be free from discrimination on the basis of

30

disability are germane to DRNM's purpose.

193.    Neither the claims asserted, nor the relief requested herein requires the participation of individual members during the course of this lawsuit.

194.    Defendants' policy of denying MOUD continuity to DRNM's constituents causes them significant harm, as outlined above.

195.    DRNM brings this suit on behalf of its constituents who are qualified individuals with a disability—specifically OUD.

196.    Drug addiction is a recognized disability under the ADA.[10]

197.    The ADA applies to people who are receiving MOUD for addiction treatment, including Plaintiff's constituents.

198.    NMCD is a public entity that receives federal funds and is subject to the ADA and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. These Acts prohibit an entity that receives federal funds from discriminating against any individual by reason of their disability.

199.    Medical care provided by NMCD is a service of a public entity that incarcerated people with disabilities must receive indiscriminately under the ADA.

200.    Defendants fail to provide people with OUD in their custody continuity of the only effective medical treatment for their chronic condition.

201.    Upon information and belief, Defendants do not deny any other people with disabilities the only effective treatment for their chronic condition.

202.    For example, Defendants do not have a blanket prohibition on providing people with diabetes effective medication for diabetes, or people with high blood pressure effective medication for their chronic condition.

_____

[10] *See* 42 U.S.C. §§ 12102 and 12131(2); 28 C.F.R. § 35.108.

203.    Defendants' denial of MOUD continuity is not a reasoned medical decision or a medical decision based on an individual need.

204.    The blanket denial of continuity of MOUD to all but pregnant people is arbitrary and capricious, is pretext for a discriminatory motive, and is discriminatory.

205.    Any treatment involving forced withdrawal is not treatment of the chronic condition, nor is it consistent with the standard of care for OUD.

206.    As set forth above, and upon information and belief, Defendants are on notice that MOUD is the only effective treatment for OUD, that it is the standard of care, and that denial of medication continuity violates the ADA.

207.    Defendants have policies that: (1) provide that individuals with disabilities shall not be discriminated against based on that disability and shall be referred to designated facilities that are capable of providing for their safety and security; (2) require that individuals have access to psychiatric treatment and MOUD treatment consistent with the standards of care; and (3) require continuity of care upon admission to NMCD.

208.    Defendants' denial of MOUD continuity to individuals entering and in their custody denies Plaintiff's constituents the benefit of these policies and public services because of their disability—OUD.

209.    Under Section 504 and the ADA, Defendants are prohibited from utilizing criteria or methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability.[11] Additionally, public entities are prohibited from using criteria or methods of administration that have the effect of "defeating or substantially impairing the accomplishment of the objectives of the public entity's program with respect to

_____

[11] *See* 28 C.F.R. §§ 35.130(b)(3)(ii) and 41.51(b)(3)(ii).

individuals with disabilities."[12]

210.   Defendants' policy and practice of denying MOUD continuity to individuals with OUD subjects Plaintiff's constituents to discrimination on the basis of disability, including the denial of access to NMCD policy of continuity of treatment consistent with the standards of care.

211.   Defendants also have program objectives, (i.e. NMCD policies) for those in its custody that include, but are not limited to: (1) employing the use of evidence-based programs and practices in the development and implementation of programs and (2) establishing protocols and guidelines for ensuring continuity and integration of care.

212.   Defendants' practice of denying MOUD continuity to people entering and in its custody substantially impairs or defeats NMCD policy and program objectives with respect to OUD.

213.   Defendants are required to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability.

214.   With respect to MOUD in NMCD, such modifications are necessary to avoid discrimination on the basis of disability (i.e. OUD).

215.   Defendants fail to reasonably accommodate Plaintiffs' constituents by refusing to provide continuity of their physician prescribed MOUD, the only effective treatment for their chronic condition.

216.   Despite revising their written policies to require the standard of care for MOUD, which includes continuity of medication, Defendants have failed to make reasonable modifications to their actual practices and procedures to ensure access to continuity of physician prescribed MOUD to those in their custody and care.

---

[12] 28 C.F.R. §§ 35.130(b)(3)(ii) and 41.51(b)(3)(ii).

## CAUSES OF ACTION

### COUNT I
### Unlawful Discrimination against Qualified Individuals in Violation of the
### Americans with Disabilities Act
### (Against All Defendants)

217.    The preceding paragraphs are incorporated as if set forth herein.

218.    The New Mexico Corrections Department is a public entity that receives federal funding and is subject to the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act, and Section 1557 of the Affordable Care Act ("ACA").

219.    Defendants' conduct as alleged in this Complaint violates Title II of the Americans with Disability Act.

220.    The ADA protects qualified individuals with disabilities from discrimination.

221.    Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or subjected to discrimination by any such entity." 42 U.S.C. § 12132.

222.    Defendants' policies and practices regarding MOUD deny Plaintiff's constituents as described herein the benefit of medical services that are available to other incarcerated individuals on the basis of their disability.

223.    By denying continuity of MOUD to those in and entering their custody, Defendants are engaging in discriminatory conduct in violation of the Americans with Disabilities Act, 42 U.S.C. § 12132.

224.    Plaintiff is entitled to declaratory and injunctive relief.

## COUNT II
### Unlawful Discrimination in Violation of Section 504 of the Federal Rehabilitation Act
### (Against All Defendants)

225.    The preceding paragraphs are incorporated as if set forth herein.

226.    Defendants' conduct as alleged in this Complaint violates Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

227.    Plaintiff is entitled to declaratory and injunctive relief.

## COUNT III
### Unlawful Discrimination in Violation of Section 1557 of the Patient Protection and Affordable Care Act
### (Against All Defendants)

228.    The preceding paragraphs are incorporated as if set forth herein.

229.    Defendants' conduct as set forth in this Complaint violates Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116.

230.    Section 1557 of the ACA incorporates the same prohibition against discrimination from Section 504 of the Rehabilitation Act as applied to "any health program or activity, any part of which is receiving Federal financial assistance[.]" 42 U.S.C. § 18116.

231.    NMCD receives federal financial assistance, including assistance from the United States Department of Health and Human Services.

232.    This includes prohibiting discrimination by a state prison system receiving federal assistance providing health care to those in its custody.

233.    The ACA requires coverage of services that come within ten general essential health benefits ("EHBs"), as defined by the Secretary of Health and Human Services ("HHS"). 42 U.S.C. § 18022(a)-(b).

234.    Such EHBs include: mental health and substance use disorder services, including behavioral health treatment, and prescription drugs. *See* 42 U.S.C § 18022(b)(1)(E)&(F).

35

235.     In violation of Section 504 and the ACA, Defendants have failed to make reasonable modifications in policies, practices, and procedures that would allow access to MOUD for those in NMCD custody, which is necessary to avoid discrimination on the basis of OUD. *See* 28 C.F.R. § 35.130(b)(7)(i).

236.     In violation of Section 504 and the ACA, Defendants have utilized methods of administration that have the effect of subjecting those in its custody to discrimination by denying access to MOUD for those who need it, on the basis of their diagnosis. *Id*. at (b)(3)(i).

237.     Because Defendants have discriminated against those in NMCD custody with OUD on grounds prohibited by Section 504 through their administrative methods, plans, and actions, Defendants are also in violation of Section 1557 of the ACA.

238.     By failing to ensure that individuals with OUD in NMCD custody have access to MOUD, Defendants have engaged in discriminatory conduct in violation of Section 1557 of the Patient Protection and Affordable Care Act. 42 U.S.C. § 18116.

239.     Plaintiff is entitled to declaratory and injunctive relief.

## COUNT IV
### Deliberate Indifference to a Serious Medical Need in Violation of the Eighth Amendment
### (Against Defendant Tafoya Lucero and Defendant Asonganyi)

240.     The preceding paragraphs are incorporated as if set forth herein.

241.     Defendants' conduct as set forth in this Complaint violates the Eighth Amendment's prohibition on cruel and unusual punishment.

242.     Defendants are aware that OUD is a serious medical condition in need of treatment.

243.     Defendants are aware that MOUD is the standard of care for OUD.

244.     Defendants are aware that failure to provide individuals with OUD this standard of care treatment increases those individuals' risk for serious harm, including overdose and death.

36

245.     Defendants are aware that forcing people entering NMCD custody to withdraw from their doctor-prescribed MOUD causes people to suffer excruciating and torturous withdrawal symptoms, both physical and psychological.

246.     Defendants have deliberately and purposefully chosen to deny individuals with OUD in NMCD custody necessary medication to treat their disorder.

247.     Defendants, while acting under color of law, deliberately, purposefully, and knowingly deny people with OUD continuity of MOUD, which is necessary medical treatment for opioid use disorder—a recognized serious medical need.

248.     Denying individuals with OUD from continuing their physician prescribed MOUD has and will place them at heightened risk for other serious medical conditions, and may trigger relapse into active addiction, potentially causing overdose and/or overdose death.

249.     Defendants' mandatory withdrawal policy and refusal to provide continuity of MOUD to individuals in NMCD custody amounts is inconsistent with society's evolving standards of decency.

250.     Forcing individuals with OUD to withdraw from their physician-prescribed MOUD amounts to an unnecessary suffering and willful, wanton infliction of pain in violation of the Eighth Amendment.

251.     Defendants' conduct described herein constitutes deliberate indifference to a serious medical need in violation of the Eighth Amendment's prohibition against cruel and unusual punishment.

## DEMAND FOR A JURY TRIAL

252.     Pursuant to Fed. R. Civ. P. 38, Plaintiff demands a trial by jury of all issues herein so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court grant the following relief and remedies:

a) Declare Defendants' practice prohibiting continuity of medication for opioid use disorder upon entry into NMCD custody or after a pregnant person is no longer pregnant to be unlawful;

b) Declare in favor of Plaintiff that Defendants are failing to comply with the requirements of the Americans with Disabilities Act, the Rehabilitation Act, and the Patient Protection and Affordable Care Act;

c) Declare that Defendants' denial of medically necessary physician prescribed essential medication to individuals entering and in their custody, as described herein, violates the Eighth Amendment of the United States Constitution;

d) Issue a permanent injunction requiring Defendants to provide continuity of MOUD, including agonist MOUD (methadone and buprenorphine), to individuals in NMCD custody;

e) Assume continuing jurisdiction as may be necessary to monitor and enforce any relief granted;

f) Award costs and attorneys' fees pursuant to 42 U.S.C. § 12205, 29 U.S.C. § 794a, 42 U.S.C. § 1988, and any other applicable provisions of law; and

g) Grant such other relief as this Court deems just and proper.

DATED: December 15, 2022                          Respectfully Submitted,


ACLU OF NEW MEXICO        DISABILITY RIGHTS NEW        THE LAW OFFICE OF
                         MEXICO                        RYAN J. VILLA
*/s/ Lalita Moskowitz*
Lalita Moskowitz          Maxwell Kauffman              Katherine Loewe

38

Maria Martinez Sanchez
P.O. Box 566
Albuquerque, NM 87103
(505) 266 5915
(505) 266 5916 (fax)
lmoskowitz@aclu-nm.org
msanchez@aclu-nm.org

*Attorneys for Plaintiff*

3916 Juan Tabo Blvd., NE
Albuquerque, NM 87111
(505) 256-3100
(505) 256-3184 (Fax)
mkauffman@drnm.org

*Attorney for Plaintiff*

5501 Eagle Rock Ave, NE
Suite C2
Albuquerque, NM 87113
(505) 256 7690
(505) 433 5812 (fax)
kate@rjvlawfirm.com

*Attorney for Plaintiff*