## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

**DISABILITY RIGHTS NEW MEXICO, INC.,**

       **Plaintiff,**

**v.**                                 **No. 1:22-CV-00954-WJ-JFR**

 **TAFOYA LUCERO, et al.,**

       **Defendants.**
_____

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS FOR LACK OF STANDING AND VIOLATION OF NEW MEXICO'S SOVEREIGN IMMUNITY
_____

For their Response to Defendants' Motion to Dismiss for Lack of Standing and Violation of New Mexico's Sovereign Immunity [Doc. 9] ("Motion"), Plaintiff respectfully states:

### INTRODUCTION

Opioid Use Disorder ("OUD") and opioid-involved overdose deaths are at an all-time high in our country. In 2020, New Mexico had the eleventh-highest drug overdose death rate in the nation—the majority of those deaths attributable to opioids. Heroin, prescription opioids, and fentanyl are readily available in every corner of our state. Their effects are devastating countless lives and are felt not only by the people of all races, genders, socioeconomic statuses, and ages who are addicted to those drugs but also the family members and communities surrounding those individuals. Of particular concern are individuals with OUD who are sentenced to incarceration in our states' prisons, as OUD is more prevalent among incarcerated people than in the general population.

Fortunately, there exist life-saving medications that help people break free from the agonizing grip of addiction. These Medications for Opioid Use Disorder ("MOUD") are widely

accepted and endorsed by nearly every major medical association across our country as the standard of care for OUD.  They include methadone, buprenorphine (commonly known as Suboxone), and naltrexone (commonly known as Vivitrol).  For incarcerated individuals, access to these medications can be a lifeline.  Further, research shows that their availability inside our prisons will likely lead to positive outcomes outside our prisons, including a reduction in return to substance abuse upon release, leading to lower recidivism and crime.

Despite their effectiveness, the New Mexico Corrections Department ("NMCD") bars people who come into NMCD facilities (with very narrow exceptions) from staying on their legally prescribed MOUD medications.  This policy runs contrary to logic, defies reason, and makes our New Mexican communities less safe.  Through this lawsuit, Disability Rights New Mexico ("DRNM") seeks to ensure that incarcerated individuals in our state are not forced to withdraw from their doctor-prescribed life-saving medications, which give them the best possible chance to escape the vicious cycles of addiction and incarceration.

## ARGUMENT

Defendants seek dismissal of Plaintiff's claims on grounds that (1) DRNM lacks standing; and (2) that the Complaint does not state a claim for which relief can be granted.  Plaintiff first addresses standing and then turns to how Plaintiff has asserted sufficient facts to state a claim that Defendants' blanket ban on MOUD continuity violates the Americans with Disabilities Act ("ADA") and Eighth Amendment rights of Plaintiff's constituents.

### I.    **DRNM Has Article III Standing**

DRNM has pled sufficient facts to establish associational standing on behalf of its constituents.

### a.   Legal Standard for Standing Challenges

A motion to dismiss under Rule 12(b)(1) challenges the subject matter jurisdiction of the federal court.  Such motions can take two approaches: (1) a facial attack on the sufficiency of the allegations relied upon to establish subject matter jurisdiction; or (2) a challenge to the jurisdictional facts, relying on evidence that goes beyond the allegations in the complaint.  *See Stuart v. Colo. Interstate Gas*, 271 F.3d 1221, 1225 (10th Cir. 2001) (citing *Holt v. Unites States*, 46 F.3d 1000, 1002 (10th Cir. 1995)).

Here, Defendants raise a facial attack.  *See* Motion at 4, n.1.  Where a defendant raises a facial attack, the court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Waldrop v. N.M. Human Serv. Dep't*, 2015 WL 13665460, at *3 (D.N.M. Mar. 10, 2015) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).

### b.   Plaintiff DRNM Has Standing to Sue on Behalf of Its Constituents Because It Is a Federally Mandated Protection and Advocacy Organization and Because It Meets All of The *Hunt* Requirements.

An organization can assert standing on behalf of its members by demonstrating: 1) that the organizations' members would otherwise have standing to sue in their own right;[1] 2) that the interests at stake are germane to the organization's purpose; and 3) that neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.  *Hunt v.*

---

[1] Courts have held that Protection and Advocacy organizations, while not typical membership organizations, still possess the requisite "indicia of membership" to justify standing.  This includes a statutorily required governing board and advisory council composed of members that adequately represent the interests of the individuals the organization serves as well as a grievance procedure accessible to the organization's constituents. *Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1111-12 (9th Cir. 2003) (holding that constituents of a P&A system had sufficient indicia of membership); *Doe v. Stincer*, 175 F.3d 879, 886 (11th Cir. 1999) (same); *see also Waldrop*, 2015 WL 13665460, at *5 (recognizing that "DRMN [sic] meets both prerequisites for associational standing to sue on behalf of unnamed plaintiffs"); Compl. ¶¶ 1-2, 184-89 (explaining DRNM structure and relationship to constituents).  Like all P&As, DRNM and its constituency possess those indicia, and ample cases affirm this. *See, e.g.*, *Lewis v. New Mexico Dep't of Health*, 2002 WL 35649595, at *6 (D.N.M. Nov. 5, 2002) (agreeing with the 11th Circuit that constituents of protection and advocacy organizations possess "'indicia of membership' evidenced by the statutory scheme" of the P&A Acts).

*Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (citing *Warth*, 422 U.S. at

511). "Although the first two requirements are constitutional in nature, the third is prudential."

*Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1109 (9th Cir. 2003) (citing *United Food &*

*Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 555 (1996)). "Unlike

the constitutional requirements . . . prudential limits on the exercise of federal jurisdiction may be

abrogated by Congress." *Id.* at 1108.

At the outset, it is crucial to note that Plaintiff DRNM is authorized by federal statutes to

pursue legal remedies on behalf of persons with disabilities, a fact that Defendants' Motion wholly

ignores. Compl. ¶ 1. Under the Protection and Advocacy for Mentally Ill Individuals Act of 1986

("PAMII") and other federal statutes,[2] DRNM may "pursue administrative, *legal*, and other

appropriate remedies to ensure the protection of individuals with mental illness who are receiving

care or treatment in the State." 42 U.S.C. § 10805(a)(1)(B) (emphasis added). As discussed below,

this point is integral to the *Hunt* analysis.[3]

> i.  DRNM's Constituents Have Standing in Their Own Right.

The first prong of the associational standing test is grounded in Article III standing

requirements. *See United Food*, 517 U.S. at 554-55. In order to establish Article III standing, a

Plaintiff must show that 1) the plaintiff has suffered or will imminently suffer an injury in fact; (2)

that there is a causal connection between the injury and the conduct complained of in the plaintiff's

---

[2] 42 U.S.C. §§ 15001, *et seq.* (2000) (Developmental Disabilities Assistance and Bill of Rights Act); 29 U.S.C. § 794e (1994) (Protection and Advocacy of Individual Rights); 42 U.S.C. §§ 10801, *et seq.* (1997) (Protection and Advocacy for Mentally Ill Individuals Act) ("PAMII").

[3] At least one court has simplified its analysis of Protection and Advocacy standing as follows: the Protection and Advocacy "standing analysis could in the future be a short one: Congress gives [a Protection and Advocacy organization] statutory standing to bring claims on behalf of its injured constituents. Constitutional standing requires only that those constituents in fact be injured; if injury is alleged, the suit may proceed. The *Hunt* test would only be called into play for associations that lack statutory standing." *Indiana Prot. & Advocacy Servs. Comm'n v. Indiana Family & Soc. Servs. Admin.*, 2022 WL 4468327, at *5, --- F.Supp.3d --- (S.D. Ind. Sept. 26, 2022).

lawsuit; and (3) that it is likely that "the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

All three Article III standing requirements are met by Plaintiff's constituents, as articulated in the Complaint. Plaintiff has alleged sufficient facts to demonstrate that constituents have suffered and are suffering an injury in fact. Defendants do not dispute this.[4] DRNM brings this suit on behalf of its constituents with opioid use disorder, a qualified disability, who are or will be deprived of their prescribed medication due to Defendants' blanket prohibition on MOUD continuity, and who experience or will experience harm due to this deprivation. *See* Compl. ¶¶ 2, 194-96. Plaintiff's Complaint includes numerous allegations regarding the severity of OUD, the necessity of treatment, and the fact that Defendants are directly causing harm to DRNM constituents by denying them the only proven treatment for their OUD. That harm can be favorably redressed by requiring Defendants to lift their blanket ban on MOUD continuity.

Plaintiff's Complaint further includes facts that establish that DRNM was aware of one or more constituents who were being harmed or would imminently be harmed by NMCD's mandatory withdrawal policy. For example, Plaintiff was in contact with criminal defense attorneys who reported that DRNM's constituents were being denied MOUD upon incarceration in NMCD facilities. Compl. ¶ 188. Plaintiff was also in contact with "Angelica" (*see* Compl. at p. 5), and others who had entered NMCD current on MOUD in 2021 and 2022 and were forced to endure withdrawal, and who continue to experience the symptoms of untreated OUD. *See* Compl. ¶ 138-39, 189.

---

[4] Rather, Defendants argue Plaintiff cannot establish associational standing under the first prong because it has failed to allege facts demonstrating that DRNM constituents have exhausted administrative remedies under the Prison Litigation Reform Act. As addressed more fully below, Defendants' reliance on the PLRA is misplaced for several reasons, including that the exhaustion requirement is not an element of standing.

"Protection and Advocacy plaintiffs" or "P&A plaintiffs" (as they are commonly known) need not name or identify specific individual constituents who have suffered an injury in fact to demonstrate standing under the first prong of *Hunt*, as courts (including the United States District Court for the District of New Mexico) have clearly held that they have "standing to sue for unnamed plaintiffs." *Waldrop*, 2015 WL 13665460, at *6; *Lewis v. N.M. Dep't of Health*, 2002 WL 35649595, at *7 (D.N.M. Nov. 5, 2002) ("Nothing in the PAMII can reasonably be read to require the [P&A Plaintiff] to name a specific individual in bringing suit to redress violations of the rights of individuals with mental illness."); *Indiana Prot. and Advocacy Servs.*, 2022 WL 4468327, at *3 (holding that where P&A plaintiff brought suit on behalf of incarcerated criminal defendants pending competency evaluations, it "need not provide a [constituent] name, so long as it [could] point to at least one specific person with an injury in fact") (citing *Disability Rights Wisconsin, Inc. v. Walworth Cty. Bd. of Supervisors*, 522 F.3d. 796, 802 (7th Cir. 2008)); *Doe v. Stincer*, 175 F.3d 879, 882 (11th Cir. 1999) (allowing for member on whose behalf association brought suit to remain unnamed).

Here, DRNM seeks relief for individuals entering and in NMCD custody who are denied MOUD continuity due to Defendants' blanket prohibition. *See, e.g.*, Compl. ¶¶ 208, 210, 212. While DRNM does not identify specific individuals by name, the organization "has spoken with constituents with OUD who were forced to withdraw from their prescription MOUD upon being sentenced to NMCD custody," *id*. ¶ 138, and "others who were forced to withdraw 'cold turkey' upon intake at NMCD," all of whom "had other underlying mental illness diagnoses." *Id*. ¶ 139. Plaintiff's constituents would have standing in their own right, and thus, DRNM meets the first prong of the *Hunt* test.

    ii.   <u>The Interests at Stake in This Litigation Are Germane to DRNM's</u>
         <u>Organizational Purpose.</u>

The second inquiry under *Hunt* is whether the interests the association seeks to protect are germane to the organization's purpose. Plaintiff DRNM exists to protect the rights of those living with disabilities in our state. Here, it is undeniable that the interests that DRNM seeks to protect through this lawsuit – the protection of the rights of individuals with OUD to be free from discrimination and constitutional violations – are clearly germane to its organizational purpose. Defendants do not dispute that this part of the test has been met by Plaintiff. Thus, the second prong of *Hunt* is easily met.

    iii.   <u>Congress Abrogated the Third Prong of the *Hunt* Test for Protection and</u>
         <u>Advocacy Organizations.</u>

The third prong of the *Hunt* test disallows associational standing where either the claim asserted, or the relief requested would require the participation of individual members of the association in the lawsuit. *Hunt*'s third prong is a prudential requirement, not a constitutional one. *Mink*, 322 F.3d at 1109. As articulated above, Protection and Advocacy organizations such as DRNM have been authorized pursuant to federal statutes to pursue legal remedies on behalf of persons with disabilities. Because of this, courts have widely held that Congress, in providing this statutory authority to Protection and Advocacy organizations, abrogated *Hunt*'s prudential limitation on standing.

In *Oregon Advocacy Center v. Mink*, the Oregon Protection and Advocacy organization brought suit on behalf of incarcerated people who were pending competency determinations. 322 F.3d 1101, 1105 (9th Cir. 2003). There, as here, defendants argued that the plaintiff "lack[ed] standing under the third prong of *Hunt* because [the plaintiff's] claim require[d] the participation of individual incapacitated [constituents]." 322 F.3d at 1112. The Ninth Circuit rejected that

argument, holding "in light of the role Congress assigned by statute to [Protection and Advocacy] organizations…, Congress abrogated the third prong of the *Hunt* test." *Mink*, 322 F.3d at 1113.

That Congress abrogated the prudential prong as to Protection and Advocacy plaintiffs is widely accepted. *See, e.g.*, *Waldrop*, 2015 WL 13665460, at *6; *Cmty. Legal Aid Soc'y, Inc. v. Coupe*, 2016 WL 1055741, at *2 (D. Del. Mar. 16, 2016) ("[T]he third *Hunt* requirement is not applicable in light of the role Congress assigned under PAMII to advocacy organizations such as [plaintiff]."); *Indiana Prot. and Advocacy Servs. Comm'n v. Comm'r, Indiana Dep't of Corr.*, 642 F.Supp.2d 872, 877-88 (S.D. Ind. 2009) (stating that Congress has overridden the prudential prong of the *Hunt* test for protection and advocacy organizations). For example, in *Cunningham v. Fed. Bureau of Prisons*, the Colorado P&A organization brought a suit seeking equitable relief for its constituents incarcerated in the Bureau of Prisons, seeking to redress unconstitutional conditions. 222 F.Supp.3d 959, 960 (D. Colo. 2015). There, the defendant also argued that "the requested equitable relief require[d] the participation of individual inmates, contrary to the third prong of [*Hunt*]." *Cunningham*, 222 F.Supp.3d at 961. The *Cunningham* court rejected defendants' argument for the same reasons as the Ninth Circuit in *Oregon Advocacy Center*. *Cunningham*, 222 F.Supp.3d at 961. In addition, the court noted that the Protection and Advocacy plaintiff was "claiming systemic violations of the Eight Amendment" and reasoned that "[p]roof of those claims may make some testimony from individual inmates necessary but it does not require the participation of all inmates affected by those practices," and thus the third prong of *Hunt* was still met. *Id*.

In addition to cases holding that P&As need not meet the third *Hunt* prong, courts have held that individual participation is not necessary where an organization seeks to adjudicate whether a policy or practice violates federal law and the party is only seeking equitable relief. For

instance, in *Waldrop*, there were two associational plaintiffs:  DRNM and The Arc of New Mexico.  *Waldrop*, 2015 WL 13665460.   It was undisputed that DRNM was the state Protection and Advocacy organization and The Arc was a "community based organization of and for people with intellectual and developmental disabilities."  *Id*. at *3.  Defendants did not challenge DRNM's standing under *Hunt*'s third prong, but did challenge The Arc's standing, contending "that because it is not an official protection and advocacy system, the Arc must satisfy the third prong of *Hunt*."  *Waldrop*, 2015 WL 13665460, at *6.  Even for a non-Protection and Advocacy organization such as The Arc, the court did not accept the defendant's argument that individual participation was necessary, explaining "that *Hunt* held that individual participation is not normally necessary when an association seeks prospective or injunctive relief for its members."  *Waldrop*, 2015 WL 13665460, at *7.  The court therefore concluded that because The Arc sought only injunctive relief, individual participation of its members was not required.  *Id*.; *accord Palacios-Valencia v. San Juan Cty. Bd. of Comm'rs*, 2016 WL 10592146, at *5 (D.N.M. Feb. 10, 2016).

   Here, Defendants do not contest that Plaintiff is the designated Protection and Advocacy organization in New Mexico or that it is "authorized by law to protect and litigate the rights of individuals with disabilities, including its constituents with OUD who are incarcerated or pending incarceration."  *See* Compl. ¶¶ 1-2, 183-87.  Nonetheless, Defendants contend that "DRNM lacks standing for its claims due to the need for individual proof by constituents necessary to prove each element of their claims under the disability laws as well as the Eighth Amendment."  Mot. at 19.  Defendants' argument fails both because they wholly neglect to acknowledge Plaintiff's position as a Protection and Advocacy organization federally authorized to bring cases such as the instant one, for which Congress abrogated *Hunt*'s third requirement for associational standing, and

because they fail to understand Plaintiff is seeking equitable relief to remedy systemic violations of its constituents' rights.

To support its argument that individual participation is critical, Defendants offer, with minimal discussion, several inapposite cases.  Mot. at 17-18.  None of the cited cases include claims brought by associational plaintiffs seeking equitable relief nor do any of them address the special standing possessed by Protection and Advocacy organizations to pursue litigation on behalf of their constituents.  Rather, each of Defendants' cited cases was brought by an individual plaintiff (or their estate) and thus, by necessity, turned on the facts of each individual's circumstances and claims.  *See* Mot. at 18 (citing *Pesce v. Coppinger*, 355 F. Supp. 3d 35 (D. Mass 2018); *Hickey v. Tomkins*, 2021 WL 858439 (D. Mass. 2021); *DeVargas v. Bd. of Cty. Comm'rs for Santa Fe Cty.*, 2021 WL 4864478 (D.N.M. Oct. 19, 2021)).  Such is not the case in this litigation, as Plaintiff is seeking equitable relief for the segment of its constituents that has been or will be harmed by Defendants' policies.

_____

Plaintiff DRNM has appropriately brought this case on behalf of its constituents.  It meets all of the *Hunt* factors and has properly asserted associational standing.

## II.   The PLRA is an Affirmative Defense with No Bearing on Standing or Jurisdiction and It Does Not Bar Plaintiff's Suit

Defendants' significant reliance on the Prison Litigation Reform Act ("PLRA") is misplaced.  The PLRA is a federal statute that states in relevant part that, "No action shall be brought with respect to prison conditions… by a *prisoner* confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C.A. § 1997e(a) (emphasis added).  The PLRA defines "prisoner" as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent

10

for, violations of criminal laws or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C.A. § 1997e(h).  Therefore, "the PLRA exhaustion requirement only applies to claims made by those who are incarcerated at the time the complaint is filed." *Armendariz v. Santa Fe Cty. Bd. of Comm'rs*, 2018 WL 3549821, at *4 (D.N.M. July 24, 2018) (citing *Norton v. City of Marietta*, 432 F.3d 1145, 1150 (10th Cir. 2005)).  *See also Dunn v. Dunn*, 219 F.Supp.3d 1163, 1176 (M.D. Ala. Nov. 25, 2016) (finding that "[t]he PLRA's exhaustion requirement… does not apply to P&As" because they are not "prisoners" as defined by the statute).  Further, failure to exhaust administrative remedies under the PLRA has no bearing on a litigant's standing but is instead an affirmative defense to be raised by the defendant.  *See Alcivar v. Wynne*, 268 Fed. Appx. 749, 753 (10th Cir. 2008) (citing *Jones v. Bock*, 549 U.S. 199, 216 (2007)); *Armendariz*, 2018 WL 3549821, at *4 ("[A] prisoner's failure to exhaust is an affirmative defense under the PLRA and inmates are not required to specially plead or demonstrate exhaustion in their complaints.").

Defendants attempt to use the PLRA to challenge DRNM's standing under both the first and third prongs of the *Hunt* test.  With regard to the first prong, Defendants contend that "[d]ue to the absence of any allegations in the complaint to address exhaustion, it is impossible to discern which, if any of DRNM's constituents might have standing 'in their own right' to pursue the claims in the complaint" and "[t]herefore the complaint does not show that DRNM has standing under the first factor in *Hunt*."  Mot. at 22.  This argument fails for the simple reason that the PLRA is an affirmative defense, not a jurisdictional requirement.  *Wynne*, 268 Fed. Appx. at 753.  Thus, the PLRA has no bearing on whether DRNM's constituents have standing to sue in their own right. However, even if the PLRA were a requirement for standing, at least some of DRNM's constituents would still have standing to sue.  Plaintiff brings this suit not only on behalf of

individuals in NMCD custody who have been or will be denied MOUD continuity, but also those pending incarceration who will be forced to withdraw from their MOUD because of Defendants' practices.   Compl. ¶¶ 1-2.   Individuals pending incarceration are not "prisoners" within the meaning of the PLRA, and the PLRA does not apply to lawsuits brought by future prisoners.   *See* 42 U.S.C.A. § 1997e(a), (h).

Regarding the third prong of the *Hunt* test, Defendants argue that individual participation is necessary to establish standing because the PLRA "requires exhaustion by each inmate asserting a conditions of confinement claim" and, thus, the lack of individual participation "precludes standing under the third prong of *Hunt*."   Mot. at 22-23.   As articulated above, the third prong of the *Hunt* test is inapplicable to Plaintiff, as it has been abrogated by Congress for Protection and Advocacy organizations.   However, assuming *arguendo* that it applies to DRNM, the *Hunt* test specifically asks whether "the claim asserted" or "the relief requested" requires individual participation of constituents.   *Hunt*, 432 U.S. at 343.   Neither the claim asserted, nor the relief requested in this case require such individual participation.

Simply stated, the PLRA is a procedural prerequisite that has no bearing on the claims asserted in a lawsuit, nor the relief requested therein.   Here, whether individual DRNM constituents have exhausted administrative remedies is irrelevant to the elements of Plaintiff's claims under the Eighth Amendment and disability laws.   Similarly, as explained in detail above, determination of the relief to be granted does not require the court to consider individual circumstances, let alone the question of whether individuals whose injuries the relief would redress have gone through the NMCD grievance process.   Defendants' reliance on the PLRA to support its standing argument under the third prong of *Hunt* is without merit.[5]

---

[5] Appropriately, Defendants do not argue that the PLRA requires DRNM itself to exhaust administrative remedies. DRNM is clearly not a "prisoner" under the plain language of the statute.  *See* 42 U.S.C.A. § 1997e(h); *see also Ross*

**III.**    <u>DRNM's Complaint States a Claim Under Both the Eighth Amendment and the ADA</u>

Plaintiff has pled facts sufficient to state claims for violations of both the Eighth Amendment and the ADA.

### a. Legal Standard for Motions to Dismiss for Failure to State a Claim

A motion to dismiss for failure to state a claim under Rule 12(b)(6) "tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994). A court will "assume the truth of all well-pleaded facts in the complaint, and draw all reasonable inferences therefrom in the light most favorable to the plaintiffs." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009). "To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead sufficient factual allegations to state a claim to relief that is plausible on its face." *Brokers' Choice of America, Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1104 (10th Cir. 2017) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)).

Generally, when ruling on a 12(b)(6) motion to dismiss, courts only examine the allegations within the four corners of the complaint. "When a party presents matters outside of the pleadings for consideration, as a general rule the court must either exclude the material or treat the motion as one for summary judgment." *Id*. at 1103. While there are exceptions allowing courts to look outside the four corners of the complaint, those exceptions are limited. In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, the Supreme Court explained that "courts must consider the complaint in its entirety, as well as… documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." 551 U.S. 308, 323 (2007). *See also Jacobsen v. Deseret*

---

*v. Blake*, 578 U.S. 632, 638 (2016) (explaining that "[s]tatutory interpretation… begins with the text" and overruling a court of appeals opinion that "made no attempt to ground its analysis in the PLRA's language"); *Coleman v. Tollefson*, 575 U.S. 532, 538 (2015) (emphasizing a "plain language" and "literal reading" of the PLRA).

*Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002) ("In addition to the complaint, the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.").   Aside from these limited circumstances, "[i]f a district court intends to rely on other evidence, it must convert the Rule 12(b)(6) motion to a motion for summary judgment, giving proper notice to the parties." *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010).

In arguing that Plaintiff has failed to state a claim for which relief may be granted, Defendants include various unsupported assertions.  For example, Defendants cite to a "pending pilot program with SAMHSA for naltrexone before and after release from custody" and make loose references to a "laying [of] groundwork for a broader [MOUD] program" sometime in the future.  Mot. at 15.  Such assertions of counsel do not fall under the limited categories of information upon which a court may rely outside the four corners of the complaint and are, thus, improper in the context of a 12(b)(6) motion.  *In re Morris Paint and Varnish Co.*, 773 F.2d 130, 134 (7th Cir. 1985) ("factual assertions made by counsel in a brief… cannot be given any weight"). The assertions of counsel here go to what evidence the parties may develop at later stages of this litigation.  The Court's "function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Jacobsen*, 287 F.3d at 941 (10th Cir. 2002).  Thus, it would be improper for this Court to consider factual allegations or assertions presented by Defendants that were not squarely alleged by Plaintiff in its Complaint.[6]

---

[6] Defendants attach several NMCD policies to their Motion.  *See* Doc. 9-1, 9-2, 9-3.  Plaintiff does not challenge the inclusion of these policies, one of which was directly referenced in the Complaint and all of which are subject to judicial notice.  That said, Defendants' unsupported assertions related to their substance abuse treatment policy [Doc. 9-1] extend beyond the text of that document.  *See* Mot. at 15. These assertions are impermissible at the pleadings stage.

**b. Plaintiff's Complaint States a Claim for Violations of the Eighth Amendment**

Plaintiff's Complaint includes sufficient allegations to state a claim for deliberate indifference under the Eighth Amendment. The Supreme Court has "held repugnant to the Eighth Amendment punishments which are incompatible with the evolving standards of decency" or which "involve the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (internal quotation marks omitted). "A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society." *Brown v. Plata*, 563 U.S. 493, 511 (2011). Therefore, under the Eighth Amendment, prison officials have an affirmative obligation to provide prisoners with necessary medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Estelle*, 429 U.S. at 104.

Corrections officials inflict cruel and unusual punishment on a prisoner in violation of the Eighth Amendment when they are deliberately indifferent to prisoners' serious medical needs. *Id.* at 104. To establish deliberate indifference, a plaintiff-prisoner must show: (1) that the medical need is or was objectively sufficiently serious; and (2) that, subjectively, officials acted with a sufficiently culpable state of mind in failing to treat that need. *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000). "Deliberate indifference to serious medical needs is shown when prison officials have prevented an inmate from receiving recommended treatment or when an inmate is denied access to medical personnel capable of evaluating the need for treatment." *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980).

Plaintiff DRNM's Complaint alleges, with particularity and detail, the following facts that establish a deliberate indifference claim:

a)   OUD is a serious, chronic medical condition that requires treatment, Compl. ¶¶ 13-27;

b)  MOUD is the undisputed standard of care for OUD, and for individuals who require MOUD, there is no appropriate or adequate substitute, *id*. at ¶¶ 41-42, 79-104, 106-09;

c)  forcing individuals entering NMCD custody to taper off their physician prescribed MOUD causes serious and irreparable harm, including excruciating withdrawal symptoms and an increased risk of overdose and death, *id*. at ¶¶ 43-48, 55-58, 65-69, 105, 133-37, 194;

d)  NMCD currently does not provide MOUD for anyone in NMCD custody other than pregnant people, who are also forced to withdraw from their medication postpartum, *id*. at ¶¶ 73, 127, 131-32, 142-44, 170;[7]

e)  this refusal is not the result of individualized medical assessment and decision-making but is instead the result of a *blanket prohibition* on the provision of MOUD in NMCD facilities, *id*. at ¶¶ 123-24, 203-04;

f)  Defendants Asonganyi and Tafoya Lucero control NMCD policy related to the provision of healthcare at NMCD facilities, including NMCD's blanket ban on MOUD continuity, *id*. at ¶¶ 3-4, 246-47;

g)  Defendants are aware that MOUD is the standard of care for OUD, and that failure to provide MOUD to incarcerated individuals in New Mexico causes ongoing serious harm, *id*. at ¶¶ 49-54, 60-69, 119-22, 128-29, 145-47, 162, 242-45; and

h)  despite this knowledge, Defendants continue to deliberately and purposefully prohibit MOUD continuity in NMCD facilities.  *Id*. at ¶¶ 142-47, 246-47.

---

[7] Defendants' Motion refers to a "pending pilot program with SAMHSA for naltrexone before and after release from custody." Mot. at 15.  This statement reflects a new fact not alleged in Plaintiff's Complaint.  Discussion of any such pilot program is inappropriate at the pleadings stage, before the Parties have undertaken discovery, and should be disregarded.  Plaintiff would also note, however, that Defendants' statements about this pilot program suggest that it will not include *continuity of medication* for those entering NMCD custody, which is the precise reason Plaintiff has brought this lawsuit.

These factual allegations are sufficient to establish a claim under the deliberate indifference standard of the Eight Amendment as further articulated below.

       i.   <u>Opioid Use Disorder Is an Objectively Serious Medical Condition.</u>

Defendants do not dispute that Opioid Use Disorder is an objectively serious medical condition nor do they dispute that they are aware of the seriousness of OUD.  For purposes of an Eighth Amendment claim, a sufficiently serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980).  Plaintiff brings suit on behalf of individuals who have been diagnosed by a physician as requiring treatment for their OUD—and each of those physicians has prescribed MOUD for that purpose.  Thus, there can be no dispute that Plaintiff's constituents meet the first, objective prong of the deliberate indifference test.

       ii.   <u>Defendants Asonganyi and Tafoya Lucero are Subjectively Aware That Their Prohibition on MOUD Continuity Poses a Serious Risk of Harm to Individuals in NMCD Custody.</u>

"The subjective component [of deliberate indifference] is met if a prison official knows of and disregards an excessive risk to inmate health or safety." *Sealock*, 218 F.3d at 1209 (quoting *Farmer*, 511 U.S. at 837).  Plaintiff makes several specific allegations showing that Defendant Asonganyi and Tafoya Lucero know that untreated OUD poses an excessive risk to the safety of individuals in NMCD custody.  For example, Plaintiff's Complaint discusses legislative testimony by Defendant Asonganyi regarding the severe impact of drugs and substance abuse in NMCD facilities.  Compl. ¶¶ 49-54.  Plaintiff further alleges that NMCD policy, for which Defendants are responsible, itself acknowledges the immense risk to individuals with OUD upon their release from correctional facilities.  *Id*. at ¶ 60-62 (discussing NMCD policy requiring Narcan to be provided

to incarcerated individuals upon their release).  Plaintiff discusses in detail NMCD's own training regarding OUD, which states that "[i]ncarceration without treatment for OUD results in increased risk for fatal overdose in the weeks following release, as compared to people who receive MOUD while incarcerated."  *Id.* at ¶ 69. *See also id.* at ¶¶ 65-68.  Plaintiff's Complaint explains that NMCD's Behavioral Bureau Chief, Dr. Wendy Price, participated in a New Mexico Department of Health Overdose Fatality Review Reentry Pilot project, which concluded as a top recommendation that MOUD should be provided to incarcerated adults. *Id.* at ¶¶ 119-22.  Plaintiff also alleges that in November of 2020, the Health Subcommittee of the Governor's Council on Racial Justice recommended to NMCD that it screen all incarcerated individuals for OUD, offer all three MOUD medications, and begin services within 24 hours of a person's arrival at an NMCD facility. *Id.* ¶ 162.  Finally, Plaintiff's Complaint states that, prior to the filing of this lawsuit, DRNM contacted Defendant Tafoya Lucero via email and certified mail and "provided information about the standard of care and the state of the law and explained that by denying MOUD to people in its custody, NMCD was discriminating against people with OUD, causing suffering, placing them at serious risk of harm, and being deliberately indifferent to their serious medical needs."  *Id.* at ¶ 128.  These allegations are more than sufficient to show Defendants' subjective awareness of the risks posed, and the harm caused, by their deliberate refusal to provide MOUD continuity.

As outlined below, courts have found deliberate indifference in situations directly analogous to the one before the Court today.

   *1. Denial of Necessary Medication Is a Form of Deliberate Indifference.*

"The outright denial of prescribed medication can substantiate an Eighth Amendment claim when the medication is used to treat a previously diagnosed illness or condition." *Ferguson v. Bd.*

*of Cnty. Comm'rs of Sierra Cnty.*, 2013 WL 12334214, at \*10 (D.N.M. Apr. 2, 2013) (citing *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1316 (10th Cir. 2002)); *Halpin v. Simmons*, 33 Fed. Appx. 961, 964 (10th Cir. 2002) (holding that prison doctors' refusal to provide certain of plaintiff's prescribed medications stated a claim establish a deliberate indifference claim); *see also Estelle*, 429 U.S. at 104-05 (prison officials show deliberate indifference by "intentionally interfering with [medical] treatment once prescribed").

For example, in *Hunt v. Uphoff*, the Tenth Circuit found that an incarcerated plaintiff stated a claim for deliberate indifference where he was denied insulin by a prison doctor after having been prescribed the medication by a previous doctor. 199 F.3d 1220, 1223-24 (10th Cir. 1999). The court rejected the defendants' assertions that the plaintiff's allegations represented a "mere disagreement with his medical treatment," noting that deliberate indifference may be "manifested by prison doctors responding to the prisoner's needs or by guards' intentionally delaying or denying access to medical care that has been prescribed." *Id*. at 1224. Similarly, in *Rutherford v. Med. Dep't of Dep't of Corrs.*, the plaintiff required liver treatment related to Hepatitis C. 76 Fed.Appx. 893, 900 (10th Cir. 2003). While incarcerated in a Colorado Department of Corrections ("CDOC") facility, he received a prescription for a one-year treatment program and received four months of the medication at that facility. *Id*. However, when transferred to a separate CDOC facility, the medical staff "discontinued the treatment and required him to 're-establish' his need for the treatment by another doctor." *Id*. The Tenth Circuit held that Mr. Rutherford had successfully stated a claim for deliberate indifference against medical staff at the second facility for refusing to continue him on his prescribed course of treatment. *Id*. at 902. *See also Arnett v. Webster*, 658 F.3d 742 (7th Cir. 2011) (allegations that prison doctors failed to continue inmate's medication for rheumatoid arthritis that was prescribed to him prior to his incarceration by an

19

outside doctor and instead provided pain medication they knew to be ineffective was sufficient to allege deliberate indifference claim).

Here, just as in *Hunt, Rutherford*, and *Arnett*, Defendants impermissibly interfere with medical treatment and deny necessary medications to incarcerated individuals by requiring people entering NMCD custody and who have just given birth to discontinue medication already prescribed by their doctors.  Compl. at ¶ 127.  Thus, a case for deliberate indifference has been made.

Defendants also rely heavily on *Hickey v. Tompkins*, 2021 WL 858439 (D. Mass. Mar. 8, 2021).  Such reliance is misguided.  In *Hickey*, an incarcerated *pro se* plaintiff filed a complaint alleging inadequate medical treatment because the county jail into which he was booked did not continue his prescribed Suboxone, along with a medication for nerve pain, when he became incarcerated.  *Id*. at *2-3.  Two months after filing his complaint, the *Hickey* plaintiff moved for a preliminary injunction.  *Id*. at *3.  The court denied the plaintiff's motion, in relevant part because the jail had begun to provide him with Suboxone during the same month in which he moved for the injunction.  *Id*.  In addressing the defendants' *motion for summary judgment*, the Massachusetts District Court found that Hickey, a *pro se* plaintiff, had not provided enough evidence to sustain his claim for deliberate indifference.  *Id*. at *4-5.

The present case is distinguishable from *Hickey* in a number of ways.  First, and perhaps most importantly, this case is still at the pleadings stage, where all well-plead facts in Plaintiff's Complaint must be taken as true whereas the *Hickey* decision was one based on a motion for summary judgment.  Second, Plaintiff's Complaint seeks *only* injunctive and declaratory relief.  Unlike in *Hickey*, where injunctive relief was no longer at issue because the evidence showed that Hickey was receiving Suboxone, no such evidence exists in this case regarding DRNM's

constituents.   Indeed, Defendants admit that individuals in NMCD are still prohibited from receiving MOUD.  Mot. at 15 (acknowledging Defendants' "lack of an existing program to dispense methadone and suboxone"); *see also* Compl. at ¶ 127, p. 26, n.7.  Finally, the Hickey plaintiff filed his case at a time when the jail in which he was incarcerated had already taken concrete steps to implement a program for the provision of MOUD, including "initiat[ing] a competitive procurement process and execut[ing] a contract with a healthcare provider to secure Suboxone treatment..."  *Id*. at *2.  By contrast, Defendants can only point to nebulous promises that one day NMCD may implement a program for the provision of MOUD, as discussed further below.  *See* Mot. at 14-15.

### 2. *Denial of Necessary Medical Care for Non-Medical Reasons Violates the Eighth Amendment.*

"[I]f necessary medical treatment is denied for nonmedical reasons, a case of deliberate indifference has been made out."  *Van Riper v. Wexford Health Sources, Inc.*, 67 Fed. Appx. 501, 504 (10th Cir. 2003) (citing *Archer v. Dutcher*, 733 F.2d 14, 16 (2d Cir. 1984)); *see also Parkell v. Danberg*, 833 F.3d 313, 339 (3d Cir. 2016) ("Systemic logistical constraints such as understaffing, which are unrelated to medical judgment, will typically not excuse failure to provide adequate medical care."); *Gates v. Collier*, 501 F.2d 1291, 1320 (5th Cir. 1974) ("Shortage of funds is not a justification for continuing to deny citizens their constitutional rights.").

In an action "challenging the entire system of health care, deliberate indifference to inmates' health needs may be shown by proving repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff or by proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care."  *Ramos v. Lamm*, 639 F.2d 559, 575-78 (10th Cir. 1980) (finding a constitutional violation and issuing injunctive relief where inmates in

Colorado often suffered harmful delays in medical treatment because prison officials lacked enough transportation vehicles to take them to the hospital in a timely manner and where prison did not have medical staff sufficiently qualified to treat inmates' medical needs).

Here, Plaintiff alleges Defendants' forced withdrawal policy is not based on sound medical judgment but is instead based in "entrenched stigma towards OUD generally and MOUD specifically, which leads to the obstruction of access to these life-saving medications." Compl. ¶¶ 171, 181-82. The Complaint does not propose any alternate theories as to why NMCD does not provide MOUD continuity. Indeed, Plaintiff's Complaint illustrates that there exists no medically-sound reason for forcibly removing individuals from their MOUD upon incarceration. At the pleadings stage, only Plaintiff's allegations are relevant, and well-plead allegations must be taken as true. Thus, Plaintiff has made out a claim for deliberate indifference by alleging that Defendants are denying necessary medical care to Plaintiff's constituents for non-medical reasons.

3. *Plaintiff's Allegations Regarding the Denial of Necessary Medical Care for Its Constituents with OUD Represents More Than a "Mere Disagreement" with NMCD's Treatment Plans.*

It is well established that, while prisoners may not be entitled to the particular treatment of their choosing, medical care in prison cannot be "so cursory as to amount to no treatment at all." *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985). *See also Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010) ("a total deprivation of care is not a necessary condition for finding a constitutional violation"); *Jones v. Muskegon Cty.*, 625 F.3d 935, 944 (6th Cir. 2010) (prison officials may not avoid liability "simply by providing some measure of treatment"). Further, prison officials may not adopt an "easier and less efficacious treatment" that does not adequately address a prisoner's serious medical needs. *Estelle*, 429 U.S. at 103-06, n. 10. Thus, the relevant inquiry under the deliberate indifference standard is not whether any medical care has

been provided, but whether constitutionally adequate care has been provided. *Halpin*, 33 Fed. Appx. At 964 ("the mere provision of continuing medical treatment, regardless of the adequacy of that treatment, does not foreclose a claim for deliberate indifference to serious medical needs"); *see also Ramos*, 639 F.2d at 574 (10th Cir. 1980) (the constitution "requires that the State make available to inmates a level of medical care which is reasonably designed to meet the routine and emergency health care needs of inmates") (internal quotation marks omitted); *Edwards v. Syder*, 478 F.3d 827, 831 (7th Cir. 2007) (treatment cannot be "blatantly inappropriate" for the condition being treated).

Defendants argue that Plaintiff's claims regarding MOUD constitute mere "disagreement with the details of a treatment plan" offered by NMCD for individuals with OUD. Mot. at 14. However, the statement in NMCD's policy that "[n]ewly arrived inmates who are currently using methadone as a form of treatment will be evaluated and assessed by the responsible physician for the appropriate treatment plan," does nothing to refute Plaintiff's claims and Defendants' admission that continuity of MOUD is not being provided in NMCD facilities to non-pregnant people. *See* Mot. at 12, 14; Doc. 9-1 at H. Regardless of what evaluation incoming individuals may undergo, Defendants have impermissibly taken the only proven-effective treatment, which Plaintiff's constituents are already receiving, completely off the table. Contrary to Defendants' assertions, the blanket denial of MOUD continuity in NMCD facilities, imposed regardless of individualized needs or evaluation, does not qualify as a "classic example[ ] of matters for medical judgment." Mot. at 14 (quoting *Callahan v. Poppell*, 471 F.3d 1155, 1160 (10th Cir. 2006)).

Defendants have not offered any information about what treatment plans are actually available to incarcerated individuals with OUD, nor could the Court consider such facts at the pleadings stage. However, Plaintiff has alleged in significant detail that for most individuals with

OUD, there is no medically acceptable substitute for MOUD.   Thus, Plaintiff's deliberate indifference claim is not defeated by Defendants' assertion that incarcerated individuals with OUD are not being entirely ignored by NMCD's medical system.

> 4. *Defendant's Vague Promises That NMCD Might Implement a Full-Scale MOUD Program at Some Unspecified Future Date Do Not Negate Current Eighth Amendment Violations.*

Where, as in this case, a plaintiff seeks injunctive relief to prevent ongoing or future serious harm, "the subjective factor, deliberate indifference, should be determined in light of the prison authorities' *current* attitudes and conduct." *Farmer*, 511 U.S. at 845 (emphasis added).   A governmental body cannot avoid liability by making "a promise, which carries no legal effect, that authorities will in the future… change their practices to conform to the Constitution." *Saba v. Cuomo*, 535 F.Supp.3d 282, 296-97 (S.D.N.Y. 2021); *see also Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. ——, 137 S. Ct. 2012, 2019 n.1, 198 L.Ed.2d 551 (2017) (governor's announcement that "he had directed the Department to begin allowing religious organizations to compete for and receive Department grants on the same terms as secular organizations" did not moot action absent assurance that governor "could not revert to its policy of excluding religious organizations"); *cf. Am. Council of Blind of N.Y., Inc. v. City of New York*, 495 F.Supp.3d 211, 248 (S.D.N.Y. 2020) (a two-page memo stating an agency policy consistent with what plaintiffs were seeking did not moot the case in part because defendants had not "pointed to any safeguards that would prevent the new policy from being changed, rescinded, or honored in the breach").   Indeed, where a prisoner-plaintiff establishes that prison officials are acting with deliberate indifference to a risk of serious harm to that plaintiff, the defendants may prevent issuance of injunctive relief only by showing "that they [are] no longer unreasonably disregarding

an objectively intolerable risk of harm *and* that they [will] not revert to their obduracy upon cessation of the litigation."  *Farmer*, 511 U.S. at 846 n.9 (emphasis added).

NMCD's vague promise to eventually implement new "MAT/MOUD protocols" that "shall be consistent with current standards of care," is insufficient to absolve it of liability for current and ongoing harms.  *See* Mot. at 13; Doc. 9-1 at J.  NMCD has provided no timeline for the new program it theoretically plans to implement, nor has it made guarantees that this program will include continuity of MOUD for people entering its facilities.  Meanwhile, DRNM's constituents continue to suffer irreparable, serious harm because of Defendants' blanket prohibition on MOUD continuity.  Compl. ¶¶ 70, 163 n.8, 188-89.  These include individuals who are currently incarcerated and require MOUD, those who will be incarcerated and require MOUD, and those who are pregnant who will be forced off of MOUD after giving birth.  Defendants cannot avoid liability simply through vague promises to eventually conform to constitutional requirements.[8]

———————————

Plaintiff has met its burden of alleging sufficient facts to support a claim for deliberate indifference under the Eighth Amendment.

---

[8] Perhaps Defendants have made specific plans or taken tangible steps toward establishing an MOUD program. But as it stands, per the allegations in Plaintiff's Complaint and Defendants' own admissions, Defendants do not provide MOUD in NMCD facilities.  If NMCD seeks to avoid liability by pointing to future plans related to its policies, at the very least Plaintiff must be afforded an opportunity to conduct discovery regarding the details of said plans.

### c. Plaintiff's Complaint States a Claim for Violations of the Americans with Disabilities Act[9]

Plaintiff challenges Defendants' policy and practice of denying Plaintiff's constituents, individuals with OUD who are prescribed MOUD, continuation of their prescribed medicine in violation of those constituents' constitutional and statutory rights. *See* Compl. ¶¶ 1-2. The remedy that Plaintiff seeks is an order declaring Defendants' conduct unlawful and enjoining Defendants from the application of their policies and practices that result in the deprivation of Plaintiff's constituents' rights. Compl. p. 38, ¶¶ a-g.

To state a claim under the ADA for denial of benefits, a plaintiff must establish: "(1) she is a qualified individual with a disability, (2) who was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, and (3) such exclusion, denial of benefits, or discrimination was by reason of a disability." *Cohon ex rel. Bass v. New Mexico Dept. of Health*, 646 F.3d 717, 725 (10th Cir. 2011). ADA claims can be brought by individuals and can also be brought by associational plaintiffs or as class actions, particularly when challenging systemic policies and practices that violate the ADA. *See, e.g.*, *Smith v. Aroostook Cty.*, 376 F.Supp.3d 146, 158-60 (D. Me. 2019) (granting a preliminary injunction for individual plaintiff with OUD who challenged jail's denial of MOUD continuity on the grounds that it "violated the ADA either by denying her the benefit of the jail's health care programs because of her disability or by refusing to make reasonable modifications to a policy and practice in order to allow her to access necessary treatment for her disability"), *aff'd*, *Smith v. Aroostook Cty.*, 922 F.3d 41 (1st Cir.

---

[9] Defendants do not challenge Plaintiff's claims under Section 504 of the Rehabilitation Act and Section 1557 of the Affordable Care Act. They instead assert that the disability claims asserted by Plaintiff "may be generally analyzed together." Mot. at 8 (citing *Cohon ex rel. Bass v. N.M. Dep't of Health*, 646 F.3d 717, 725-26 (10th Cir. 2011); *Francois v. Our Lady of the Lake Hosp. Inc.*, 8 F.4th 370, 378 (5th Cir. 2021)). Because Defendants only make arguments under the ADA, Plaintiff limits its response to that statute but reserves argument on the merits of the 504 and 1557 claims.

2019); *M.C. v. Jefferson Cty., New York*, 2022 WL 1541462 (N.D.N.Y. May 16, 2022) (slip copy) (class of individuals with OUD who were prescribed MOUD certified to challenge jail's systemic practice of denying MOUD on the grounds it violated the ADA); *McClendon v. City of Albuquerque*, 2014 WL 12796782, at *2 (D.N.M. Apr. 21, 2014) (describing the plaintiff-intervenor subclass of prisoners with developmental or mental disabilities which alleged defendants violated their rights under the Constitution, ADA, and Rehabilitation Act).

Plaintiff alleges sufficient facts to support several theories of liability under the ADA, including denial of medical services, failure to accommodate, and discriminatory methods-of-administration.  Defendants only challenge Plaintiff's ADA claim as to denial of medical services. Defendants did not challenge these other theories of liability and thus any argument is waived for the purposes of Defendants' Motion.  *See United States v. Harrell*, 642 F.3d 907, 918 (10th Cir. 2011) ("[A]arguments raised for the first time in a reply brief are generally deemed waived."). However, Plaintiff will briefly address the claims not challenged by Defendants, in addition to its claim for denial of medical services.

### i.   Plaintiff States a Claim for Denial of Medical Services.

Plaintiff brings this suit on behalf of its constituents with OUD—a qualified disability— who are prescribed MOUD.  *See, e.g.*, Compl. ¶¶ 1-2, 115, 195.  Plaintiff alleges that NMCD is a public entity subject to Title II of the ADA.  *Id*. ¶¶ 198-99, 218-19.   Plaintiff alleges that Defendants refuse to provide Plaintiff's constituents with access to MOUD continuity upon entering NMCD custody.  *See, e.g.*, *id*. ¶¶ 170, 200.  This refusal to provide MOUD continuity deprives Plaintiff's constituents of meaningful access to the benefits of Defendants' healthcare services.  *See id*. ¶¶ 167-70, 208, 222.  Defendants' refusal to provide MOUD continuity is not based on individual medical determinations but is instead an administrative decision. *See id*. ¶¶

203, 144.  The denial of MOUD continuity discriminates against Plaintiff's constituents based on their disability—OUD.  *See id.* ¶¶ 167-82, 200-16.  These allegations, repeated throughout the Complaint, are sufficient at the pleadings stage to state a claim upon which relief can be granted.  *See, e.g.*, *M.C.*, 2022 WL 1541462, at *1, 4-5 (granting a preliminary injunction for a class where plaintiffs alleged substantially the same facts).

Nonetheless, Defendants argue that Plaintiff fails to state a claim under the ADA for two reasons.  First, Defendants assert that the ADA "does not provide a remedy for medical negligence or a means to challenge 'purely medical decisions' regarding the propriety of a course of treatment."  Mot. at 12 (citing *Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1144 (10th Cir. 2005)).  Second, Defendants argue that Plaintiff's allegations do not plausibly show that Defendants deny individuals in their custody MOUD "'because' of their opioid use disorder or other disability."  *Id.* (citing *Murray v. Mayo Clinic*, 934 F.3d 1101, 1110 (9th Cir. 2019)).

Defendants misconstrue Plaintiff's Complaint as simply challenging Defendants' inadequate medical treatment of certain individual inmates with OUD.  Mot. at 11-13.  However, Plaintiff is explicit that this suit presents a challenge to Defendants' *systemic denial of MOUD continuity* for all incarcerated individuals with OUD.  *See, e.g.*, Compl. ¶¶ 2, 73, 123-24, 204.  Plaintiff alleges that this denial is a blanket policy that precludes individualized medical determinations regarding treatment of individuals with OUD, and thus is not simply a case of differing medical opinions.  Compl. ¶¶ 124, 203.

A policy that "prevents individual assessment," and so "necessarily operates to exclude disabled people that are qualified" to participate in a job, program, or service, "constitutes a per se violation" of the ADA.  *Steffen v. Donahoe*, 680 F.3d 738, 742 n.2 (7th Cir. 2012) (observing that an "individualized evaluation is required by the ADA"); *see also Gardenhire v. Manville*, 2017

WL 445506, at *8 (D. Kan. Feb. 2, 2017), *aff'd*, *Gardenhire v. Manville*, 722 Fed. Appx. 835 (10th

Cir. 2018) (recognizing "that a blanket policy of requiring employees to be '100% healed' before

returning to work is a per se violation of the ADA" because it precludes individualized assessment

of need for accommodation).  "Accordingly, blanket exclusions are to be given the utmost scrutiny,

and are, as a general rule, to be discouraged."  *Farris v. Kohlrus*, 2023 WL 1971143, at *6 (C.D.

Ill. Feb. 13, 2023) (quoting *Bombrys v. City of Toledo*, 849 F.Supp. 1210, 1219-20 (N.D. Ohio

1993)) (finding prison program with blanket ban on psychotropic medications to be a per se

violation of the ADA).  NMCD's blanket exclusion of MOUD continuity "permits no

consideration or accommodation of a prisoner's particular circumstances," and therefore is a per

se violation of the ADA.  *See id*.

      The instant case is similar to *M.C. v. Jefferson County, New York*, where the district court

granted a preliminary injunction to a class of plaintiffs defined as "all non-pregnant individuals

who are or will be detained at Jefferson Correctional and had or will have prescriptions for MOUD

at the time of entry into defendants' custody."  2022 WL 1541462, at *1.  There, plaintiffs alleged

that "defendants maintain[ed] a policy of banning [MOUD] for non-pregnant individuals in their

custody, and that this ban violate[d the] putative class's rights under the [ADA], the Eighth and

Fourteenth Amendments, and related state law."  *Id*.  The allegations made in *M.C.* are essentially

the same as DRNM makes here.

      In *M.C.*, the court evaluated plaintiffs' likelihood of success on the ADA and constitutional

claims under the more stringent standard for a preliminary injunction.  As to the ADA claim, the

court found plaintiffs had demonstrated a substantial likelihood of success on the merits.  *Id*. at *4.

The court briefly explained:

        Plaintiffs have been diagnosed with OUD and will be eligible for medical treatment
        while incarcerated at Jefferson Correctional, an entity subject to Title II.  The

refusal to provide access to methadone deprives plaintiffs 'meaningful access' to Jefferson Correctional's healthcare services.

*Id.* (citing *Aroostook*, 376 F.Supp.3d at 160). The court's ruling for the class in *M.C.* is in accord with the line of cases explaining that there is a difference between "ADA claims based on negligent medical care [and] those based on discriminatory medical care." *Aroostook*, 376 F. Supp. 3d at 159 (quoting *Kiman v. N.H. Dep't of Corr.*, 451 F.3d 274, 284 (1st Cir. 2006)). These cases explain that where there is a general practice of denying prescribed necessary medication without justification, the general practice or blanket policy that brought about the denial may be so unreasonable as to raise the inference that it was based on disability discrimination. *See, e.g.*, *Aroostook*, 376 F.Supp.3d at 159-60; *Pesce v. Coppinger*, 355 F.Supp.3d 35, 47 (D. Mass 2018) (granting a preliminary injunction and holding "[a]bsent medical or individualized security considerations underlying the decision to deny access to medically necessary treatment," the defendants' policy of denying MOUD was "either arbitrary or capricious-as to imply that it was pretext for some discriminatory motive or discriminatory on its face") (quoting *Kiman*, 451 F.3d at 284).

Here, Plaintiff alleges that Defendants have a blanket ban on MOUD continuity for all but pregnant women. *See, e.g.*, Compl. ¶¶ 126-27, 131, 144, 170, 204. Under this ban, Defendants deny Plaintiff's constituents MOUD continuity for reasons other than their individualized medical needs. Taking these allegations as true, Defendants' de facto policy is precisely the type of policy that the *M.C.*, *Aroostook*, and *Pesce* courts have held is discriminatory.

ii. Plaintiff States a Claim for Failure to Accommodate.

Plaintiff alleges that by denying MOUD continuity, Defendants fail to provide reasonable accommodations for qualified individuals with OUD. Compl. at ¶¶ 124, 213-16. In addition to prohibiting discrimination, the ADA "places an affirmative obligation on public entities to

reasonably accommodate qualified individuals with disabilities to allow them to participate in its programs and services." *Brooks v. Colorado Dep't of Corr.*, 12 F.4th 1160, 1167 (10th Cir. 2021); 28 C.F.R. § 35.130(b)(7) (ADA regulations requiring public entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability"). To state a claim for failure to accommodate, a plaintiff "must show: (1) he is a qualified individual with a disability; (2) he was excluded from participation in or denied the benefits of some public entity's services, programs, or activities; and (3) such exclusion or denial of benefits was by reason of his disability." *Brooks*, 12 F.4th at 1167. "A claim for failure to make a reasonable accommodation does not require a showing of discriminatory motive." *Id*. However, in order for an entity to be liable for failure to accommodate, "the entity must have knowledge that an individual's disability limits her ability to participate in or receive the benefits of its services." *Robertson v. Las Animas Cty. Sheriff's Dep't*, 500 F.3d 1185, 1197 (10th Cir. 2007). "[A] public entity is on notice that an individual needs an accommodation when it knows that an individual requires one, either because that need is obvious or because the individual requests an accommodation." *Id*. at 1197-98.

Plaintiff alleges facts sufficient to support a failure to accommodate claim. First, Plaintiff alleges that its constituents with OUD have a qualified disability which substantially impairs one or more life activities. *See* Compl. at ¶¶ 115, 195-97. Second, Plaintiff alleges Defendants have ample notice that individuals with OUD cannot meaningfully participate in rehabilitative services, programs, and activities without an accommodation: namely continuation of their MOUD. *See* Compl. at ¶¶ 52-54, 66-70, 119-22, 128-29, 162. For example, Plaintiff's Complaint summarizes testimony by Defendant Asonganyi that "drug use in prisons interferes with incarcerated individuals' ability to fully participate in programing and leads to behavioral issues within the

prison."  Compl. ¶ 52.  Finally, Plaintiff alleges that Defendants continue to deny MOUD continuity to these individuals, and thus have failed to make the necessary accommodation.  *See* Compl. at ¶¶ 70, 73, 77, 126-27, 188-89.

iii.   Plaintiff States a Claim for Discriminatory Methods-of-Administration.

The ADA also recognizes a "methods of administration" claim that prohibits public entities from using "criteria or methods of administration ... that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability."  *See* 28 C.F.R. § 35.130(b)(3)(i) (implementing the ADA); 28 C.F.R. § 41.51(b)(3)(i) (implementing the RA). Also, public entities are prohibited from using criteria or methods of administration that have the effect of "defeating or substantially impairing the accomplishment of the objectives of the public entity's program with respect to individuals with disabilities."  *See* 28 C.F.R. § 35.130(b)(3)(ii); 28 C.F.R. § 41.51(b)(3)(ii).

Here, Plaintiff alleges that Defendants have policies that include, but are not limited to: (1) employing the use of evidence-based programs and practices in the development and implementation of programs and (2) establishing protocols and guidelines for ensuring continuity and integration of care.  Compl. ¶ 211.  By enforcing a blanket prohibition on MOUD continuity, Defendants administer these programs in a manner that subjects individuals with OUD to discrimination based on their particular disability.  Defendants' practice of denying MOUD continuity to people entering and in NMCD custody also substantially impairs or defeats NMCD policy and program objectives with respect to some individuals with the disability of OUD.  *Id*. at ¶ 212.  Defendants have failed to make reasonable modifications to their actual practices and procedures to ensure access to continuity of physician prescribed MOUD for those in their custody and care—defeating the accomplishment of NMCD's own policies.  *Id*. at ¶ 216.  Therefore, the

Complaint articulates a plausible methods-of-administration claim.  *See State of Connecticut Office of Prot. & Advocacy for Persons with Disabilities v. Connecticut*, 706 F. Supp. 2d 266, 277-78 (D. Conn. 2010) (denying motion to dismiss administrative methods claim where complaint alleged defendants failed to adequately assess and identify the long-term care needs of plaintiffs); *Kathleen S. v. Dep't of Pub. Welfare of the Commonwealth of Pennsylvania*, 10 F.Supp.2d 460, 471-76 (E.D. Pa. 1998) (finding defendant utilized discriminatory administrative methods by failing to timely initiate transition planning and noting the defendant had "apparently been apathetic and indifferent to the mandate of Congress set forth in the ADA").

iv.   Defendants' Unsupported Assertions Regarding the Possibility of a Future MOUD Program Do Not Defeat Plaintiff's Claims Under the ADA.

Finally, Defendants point to NMCD's revised withdrawal policy in support of their Motion. Mot. at 12-13.  Defendants simply quote or paraphrase the policy.  *Id*.  Defendants, through counsel's assertions, argue that the policy contemplates the implementation of a MAT program in the future.[10]  *Id*. at 13.  Then, Defendants simply conclude "the facts do not plausibly show under, [] any calculus, that inmates are being deliberately discriminated against in the provision of medical services because of their disability."  Mot. at 13.

As to this policy, Plaintiff's Complaint acknowledges the policy and alleges "Defendants' current practice continues to deny people with OUD who are on methadone or suboxone their medications."  Compl. ¶ 126; *see also id.* ¶ 143.  Plaintiff alleges that even after the recent policy revision mentioning an eventual MOUD program, Defendants confirmed that not a single New Mexico prison provides MOUD continuity.  *Id*. ¶ 127.  Plaintiff further alleges that "Defendants'

---

[10] Again, any statements about the policies are unsupported assertions of counsel not to be considered by the Court. *In re Morris Paint and Varnish Co.*, 773 F.2d 130, 134 (7th Cir. 1985) ("factual assertions made by counsel in a brief… cannot be given any weight").  Certainly, counsel's speculation regarding the future significance of a policy or program not currently being implemented must be disregarded.

denial of MOUD continuity is not a reasoned medical decision or a medical decision based on individual need." *Id.* ¶ 203. Thus, Plaintiff alleges that despite this policy, Defendants continue to discriminate against Plaintiff's constituents. This is a "blanket policy prohibiting the use of MOUD" that, per guidance from the federal agency charged with enforcing the ADA—the U.S. Department of Justice—runs afoul of the ADA. *Id.* ¶ 116. Simply having a policy on paper does not absolve Defendants of liability or defeat Plaintiff's claims at the 12(b)(6) pleading stage.

As set forth above, here, Plaintiff alleges that Defendants maintain a blanket ban on MOUD continuity which categorically and without reason denies people with OUD access to their necessary physician prescribed medication. In short, Defendants' refusal to provide MOUD continuity is "so unreasonable . . . as to imply that it [is] pretext for some discriminatory motive, such as animus, fear, *or apathetic attitudes*." *See Hickey v. Tompkins*, 2021 WL 858439, at *6 (D. Mass. Mar. 8, 2021) (slip copy) (quoting *Lesley v. Chie*, 250 F.3d 47, 55 (1st Cir. 2001)) (emphasis added). Apart from pretext, Plaintiff alleges that Defendants' blanket denial of MOUD properly prescribed by a medical provider is also discriminatory on its face, as a reflection of stigma around opioid addiction and misconceptions about MOUD treatment; Defendants' practice upholds this discriminatory belief. [11] Compl. ¶¶ 171-82. This blanket denial of MOUD is not a medical decision, rather it is a discriminatory administrative decision.

To the extent the Court considers the policy provided by Defendants to resolve this motion, the Court must convert the motion into a Rule 56 motion and allow for limited discovery. *See Gee v. Pacheco*, 627 F.3d 1178, 1186-87 (10th Cir. 2010) (holding that even if the district court did not

---

[11] Plaintiff also alleges that Defendants' ban on MOUD continuity results in Defendants treating OUD differently than other disabilities and denies individuals with OUD the benefit of several of NMCD's programs. *See* Compl. ¶¶ 199-202, 207-08. These allegations lend further support to the assertion that Defendants' denial of MOUD continuity is by reason of individuals' particular disability—OUD. *See Romero v. Bd. of Cty. Comm'rs for the Cty. of Curry*, 202 F.Supp.3d 1223, 1265-66 (D.N.M. 2016) (explaining that disabled plaintiffs may prove discrimination is by reason of their disability where they are treated differently than members of a similarly situated class).

err in reviewing documents outside the pleadings, it improperly relied on them to refute plaintiff's factual assertions thus converting the pleading into a motion for summary judgment without notice). By quoting widely from their policies, Defendants are implicitly asking the Court to draw inferences as to what happens in practice and to refute Plaintiff's allegations. Defendants ask the Court to take at face value that individualized medical determinations as to MOUD continuity are made for each constituent entering Defendants' custody and to *infer* that there is even a chance Defendants would "transfer the inmate to an appropriate provider or make other arrangements to ensure specific inmates' medical needs are met." Mot. at 13. This is evidence that needs to be developed before the Court can consider it to refute Plaintiff's allegations. However, the Court can and should simply exclude the policy and discount the assertions of counsel to find that Plaintiff's Complaint is sufficient to support ADA, RA, and ACA claims on its face at the 12(b)(6) stage.

**IV.  Defendants' Sovereign Immunity Claim is Without Merit**

Defendants raise sovereign immunity as to Plaintiff's Eighth Amendment claim, arguing that "any 8th Amendment claim, if one exists, must be dismissed against the Department [of Corrections]." Mot. at 23. Plaintiff's Complaint makes clear that Count IV is asserted against Defendants Tafoya Lucero and Asonganyi only. There exists no Eighth Amendment claim against NMCD, and Defendants' discussion of sovereign immunity is therefore unnecessary.

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully asks this Court to deny Defendants' Motion to Dismiss for Lack of Standing and Violation of New Mexico's Sovereign Immunity.

Respectfully Submitted,

| ACLU OF NEW MEXICO | DISABILITY RIGHTS NEW MEXICO | THE LAW OFFICE OF RYAN J. VILLA |
|---|---|---|
| */s/ Lalita Moskowitz* | | |
| Lalita Moskowitz | Maxwell Kauffman | Katherine Loewe |
| Maria Martinez Sanchez | 3916 Juan Tabo Blvd., NE | 5501 Eagle Rock Ave, NE |
| P.O. Box 566 | Albuquerque, NM 87111 | Suite C2 |
| Albuquerque, NM 87103 | (505) 256-3100 | Albuquerque, NM 87113 |
| (505) 266 5915 | (505) 256-3184 (fax) | (505) 256 7690 |
| (505) 266 5916 (fax) | mkauffman@drnm.org | (505) 433 5812 (fax) |
| lmoskowitz@aclu-nm.org | | kate@rjvlawfirm.com |
| msanchez@aclu-nm.org | | |
| | | |
| *Attorneys for Plaintiff* | *Attorney for Plaintiff* | *Attorney for Plaintiff* |