Fiscal impact reports (FIRs) are prepared by the Legislative Finance Committee (LFC) for standing finance committees of the Legislature. LFC does not assume responsibility for the accuracy of these reports if they are used for other purposes.

# FISCAL IMPACT REPORT

| | |
|---|---|
| **SPONSOR** SFC | **LAST UPDATED** 3/10/2023 |
| | **ORIGINAL DATE** 3/6/2023 |
| **SHORT TITLE** County Detention Facility Treatment Programs | **BILL NUMBER** CS/CS/Senate Bill 425/SHPACS/SFCS/SF1#1 |
| | **ANALYST** Gray/Rabin |

### ESTIMATED ADDITIONAL OPERATING BUDGET IMPACT*
(dollars in thousands)

| | FY23 | FY24 | FY25 | 3 Year Total Cost | Recurring or Nonrecurring | Fund Affected |
|---|---|---|---|---|---|---|
| MAT program costs - direct | No fiscal impact | $650 | $5,050 | $5,700 | Recurring | General Fund |
| MAT program costs – indirect | No fiscal impact | No fiscal impact | $1,200 | $1,200 | Recurring/Nonrecurring | General Fund |
| MAT program benefits – reduced recidivism | No fiscal benefits | No fiscal benefits | ($1,054) | ($1,054) | Recurring | State, county, and local general funds |
| MAT program benefits – other | No fiscal benefits | No fiscal benefits | ($4,940) | ($4,940) | Recurring | State, county, and local general funds |
| DOH Implementation | No fiscal impact | $250 | $250 | $500 | Recurring | General Fund |
| HSD Implementation | No fiscal impact | $188.70 | $188.70 | $377.4 | Recurring | General Fund |
| **Total** | **No fiscal impact** | **$1,088.7** | **$695.2** | **$1,783.4** | **Recurring & Nonrecurring** | |

Parentheses ( ) indicate expenditure decreases.
*Amounts reflect most recent analysis of this legislation. This analysis assumes no costs are reimbursable by Medicaid.

Relates to appropriation in the General Appropriation Act

### Sources of Information

LFC Files

Responses Received for Original Bill
New Mexico Attorney General (NMAG)
Administrative Office of the District Attorney (AODA)
New Mexico Corrections Department (NMCD)
Department of Health (DOH)
Human Services Department (HSD)

**SUMMARY**                                                                                                  **Exhibit 2**

**Synopsis of Senate Floor Amendment of SFC Substitute for Senate Bill 425**

The Senate floor amendments to the Senate Finance Committee substitute for Senate Bill 425 changes the date by which the Corrections Department (NMCD) is required to implement medication-assisted treatment (MAT). The amendment changes the two required implementation dates:
- For people with prescriptions for MAT, the required date to provide MAT is changed from the end of FY24 to halfway through FY25 (end of calendar year 2025);
- For all incarcerated people, the required date to provide MAT is changed from the end of FY25 to the end of FY26.

The amendment also strikes reference to the establishment of MAT programs in county-operated facilities from the title of the bill.

**Synopsis of SFC Substitute for Senate Bill 425**

The Senate Finance Committee substitute for Senate Bill 425 creates the "medication-assisted treatment (MAT) for the incarcerated program fund" in the Human Services Department (HSD) to administer MAT to people in county operated jails and state correctional facilities. The bill requires the New Mexico Corrections Department (NMCD) to provide MAT to people in their facilities by the end of FY25.

HSD would also be required to provide an annual report to the Legislative Health and Human Services Committee and Legislative Finance Committee beginning October 1, 2023.

This bill does not contain an effective date and, as a result, would go into effect June 16, 2023, (90 days after the Legislature adjourns) if signed into law.

## FISCAL IMPLICATIONS

***Cost to Implement MAT.*** The bill requires NMCD to establish and operate a MAT program in all state corrections facilities by the end of FY26. NMCD estimates it will cost $3 million to operate a MAT program at a single detention facility housing 250 people. However, this estimate depends on the facility's size, and it would be imprecise to apply that measure to each facility.

Instead, this analysis estimates the cost to administer MAT to all people who need them in state corrections facilities and county detention facilities because that is the presumptive intent of the bill. This analysis estimates the costs to treat all individuals using MAT to be $11.3 million.

Within this estimate, there are direct treatment costs—the cost of medication and personnel—and indirect administrative costs—the cost of the facilities and infrastructure, which are both recurring and nonrecurring. These are summarized on the operating fiscal impact table on page one, but they are provided with more detail here.

CS/CS/Senate Bill 425/SHPACS/SFCS/SF1 – Page **3**

**Cost Breakdown of Implementing MAT in State Facilities**
(in thousands)

|  | Direct costs (medication, personnel) Period: *FY25 and Subsequent FYs* | Indirect & recurring (administration) Period: *FY25 and Subsequent FYs* | Indirect & nonrecurring (facilities) Period: *FY25* | Total costs |
|---|---:|---:|---:|---:|
| Corrections facility (state) | $10,067 | $503 | $705 | **$11,275** |

It is estimated that NMCD will increase staffing levels to prepare for implementation at a cost of $650 thousand. It is also assumed that FY25 will see half of the total required costs, and that in FY26 the full extent of the costs will be borne. The assumptions used to create the estimate are below.

***Benefits to Implement MAT.*** No agency analysis provided an estimate of the benefits associated with providing MAT to justice-involved individuals, but research has demonstrated the link between appropriate opioid use disorder (OUD) treatment—like MAT—and net benefits to government systems, including reduced recidivism, reduced healthcare costs, and reduced mortality. LFC's New Mexico Results First Initiative estimates the direct benefits to taxpayers and the total benefits of administering certain programs, including MAT. This analysis estimates the benefits to taxpayers and all government systems to be $12 million annually. These are summarized on the operating budget impact table on page one, but they are provided with more detail in the table below.

**Benefit Breakdown of Implementing MAT in State Detention Facilities**
(in thousands)

| Benefit description | Total Benefits (per year in thousands) |
|---|---:|
| Reduced healthcare costs | $569 |
| Improved labor market outcomes | $1,004 |
| Reduced recidivism costs | $2,108 |
| Preventive mortality costs | $8,306 |
| **Total** | **$11,987** |

Note that these benefits are shared across government systems at both the state, county, and local level, but the state is the sole appropriator for county MAT programs and for state prison facilities.

It is estimated that FY25 will see half of these benefits and FY26 will see the full extent of these benefits. The assumptions used to create the estimate are below.

***Net Positive Benefits.*** Administering MAT in correctional settings is associated with net positive benefits. As reflected on page one, the start-up costs to implementing universal MAT in correctional contexts are significant and are estimated in this analysis to be about 7 percent of total recurring costs. This means that in the first year it will likely cost more to operate than the associated benefits. However, in FY26 and subsequent fiscal years the estimated net positive benefits is about $698.3 million recurring across all government systems.

These benefits would be shared across all government systems—state, county, and local—while the costs are borne just by the state.

**Cost Assumptions.** The total prison population averaged about 5,700 in FY22. A 2018 study estimated about 16 percent of people released from prison tested positive for opioids at least once per year. For a conservative estimate, this analysis assumes 20 percent of all people in state correctional facilities and in jails need MAT programs.

Treatment cannot be administered by force, but, in order to provide a high-end estimate, this analysis assumes all of the in-need prison population would utilize MAT services. The National Institute on Drug Abuse notes the costs of MAT for OUDs are, on average, $8,831 per year per person. Indirect recurring costs are estimated to be 5 percent of the total direct costs and will be borne in FY25 and subsequent fiscal years. Indirect nonrecurring costs are estimated to be 7 percent of the total direct costs and will only be borne in FY25.

It is estimated all costs will be borne by the state and that none of the MAT program costs will be reimbursable with Medicaid. However, some types of treatment may currently be reimbursable or may be reimbursable in the future based on federal policy changes.

**Benefits Assumptions.** The estimates of benefits associated with SB425 come from the New Mexico Results First Initiative, a Legislative Finance Committee model for cost-benefit analyses. This analysis uses that model to predict benefits. Benefits are shared across government systems and are associated with labor market effects, healthcare costs, recidivism, and mortality.

Note this benefits analysis does not include the value of a statistical life (VSL). Should enactment of this legislation prevent deaths among MAT recipients, the benefits may be greater because VSL is significant. For example, researchers at the Washington State Institute for Public Policy estimate VSL can range from $4 million to $10 million dollars per life.

**Additional DOH MAT Costs.** In addition to providing MAT in correctional facilities, Department of Health (DOH) analysis notes individuals will need to continue treatment after they are released from state correctional facilities.

The shortage in community-based providers for justice-involved people is a known barrier. DOH has some limited resources for providing MAT. The agency notes that absorbing additional patients who need MAT would be challenging. This demand may create the need for developing additional services or operations that could increase costs. The estimated costs to increase DOH capacity is $500 thousand, half of which will be borne in FY24 and FY25.

**HSD Costs.** The Human Services Department (HSD) estimates that administering this major increase in MAT funding and programmatic insight will require 3 additional FTE, for a total cost of $282.7 thousand annually. The agency noted administration of the funding would require extensive collaboration with counties and the NMCD.

**Medicaid Leveraging.** HSD notes the appropriation as currently described cannot be matched with Medicaid federal funds. The agency analysis notes:
> Justice-involved individuals are not defined as inmates until 30 consecutive days of incarceration/detention (NMAC 8.200.410.17). Medicaid-enrolled individuals are eligible for Medicaid coverage prior to the suspension of Medicaid benefits. The inpatient or outpatient services must be covered by Medicaid and provided by a network provider of the member's MCO (prior authorization may be required for some services). Medication

> Assisted Therapy (MAT) services are an exception to the requirement that outpatient services be provided outside of the correctional or detention center. MAT services may be administered to a Medicaid enrolled individual who has been incarcerated for less than 30 days, in the facility of incarceration by a Medicaid enrolled provider who is certified to perform the service (NM Managed Care contracts 4.5.16.6).

## SIGNIFICANT ISSUES

**MAT Background.** MAT is widely accepted to be the standard of treatment for opioid use disorder (OUD) and can be very effective for alcohol use disorder as well, although there is less agreement about how best to treat other substance use disorders (SUDs). MAT combines psychosocial counseling with FDA-approved medications—methadone, naltrexone or buprenorphine—and has been demonstrated to be safer and more effective than either psychotherapy or medication alone, primarily because research shows it doubles the odds a person will be able to avoid relapse and stay in recovery for at least a year, and the more time without relapse the better. (See "Substantive Issues" below.)

**MAT in Detention Facilities.** A 2019 LFC program evaluation noted:
> The Metropolitan Detention Center (MDC) has offered inmates methadone maintenance–meaning if they arrive already using methadone, they can continue to receive their medication–since late 2005. Methadone in prisons was highly unusual in 2005, and unfortunately remains so today; as a 2013 study of the MDC's methadone maintenance treatment (MMT) program noted, immediate (and often unsupported) detox is the standard of practice in prisons around the state and the country, while the medical standard of care is MAT. The MMT program combines methadone administration with cognitive behavioral therapy.

Research from MDC's Opioid Treatment Program has shown reduced recidivism for individuals enrolled in community-based methadone maintenance program upon their release, and the program has also been shown to have reduced associated costs for the detention center.

Analysis from HSD notes MAT has been associated with substantial recidivism reductions, reduced death rates for people in prisons, and decreased disciplinary tickets within detention facilities. Both Rhode Island and California saw a decrease in statewide overdose deaths after the implementation of MAT in statewide facilities.

**Health Impacts.** From DOH analysis:
> Individuals in jail or prison represent a particularly high-risk population: within three months of release from custody, 75 percent of people who were in prison or jail with an opioid use disorder experience a relapse to opioid use. And incarcerated persons who are released to the community are between 10 and 40 times more likely to die of an opioid overdose than the general American population—especially within a few weeks after reentering society. It is possible to prevent relapse and overdose through the use of medication-assisted treatment within the fabric of the criminal justice system.
>
> In 2016, the state ranked fourth in the nation for suicide and has, over the past two decades, consistently reported suicide rates that are at least 50% higher than the U.S. rate. Significant inverse relationships are found between youth risk and rates of substance use. Increased access to substance use treatment may also impact suicide and suicide-related

behaviors in New Mexico.

Another concern is the increase in the proportion of women using opioids during pregnancy. Substance use during pregnancy is an overarching public health issue and can lead to health effects for both the infant and the mother. This includes Neonatal Abstinence Syndrome (NAS) which can have long-term effects on the neurodevelopment of children up to and including school age.  In 2016, the incidence of NAS in New Mexico was 12.2 cases per 1,000 hospital births, one of the highest incidence rates of Neonatal Abstinence Syndrome in the country. In addition, the NAS rate in New Mexico has been increasing every year for the past decade.  Appropriate treatment of incarcerated individuals with MAT may reduce the incidence of NAS.

## CONFLICT, DUPLICATION, COMPANIONSHIP, RELATIONSHIP

This bill relates to an appropriation in the House Appropriations and Finance Committee substitute for House Bill 2, which contemplates appropriating $3.5 million to the Department of Health for MAT.

## OTHER SUBSTANTIVE ISSUES

### Background on Medication-Assisted Treatment

None of these medications is a cure for substance use disorder, and standard of practice for each of them stresses they should be used as part of a comprehensive therapeutic approach. Each of them in some way limits the positive experience of the substance, essentially buying a person time to remain sober and in treatment long enough to address the underlying causes of the disorder and change the behavior patterns. Best practices for all of these medications indicate patients should be maintained on them for months or even years, depending on their individual experience with SUD and their recovery process. It frequently takes those who have been chronically abusing drugs or alcohol several months to re-establish some form of stability in their lives, and only then can they begin to focus on recovery. The drugs listed here are FDA approved for treatment of substance use disorder. An array of other drugs may be used as off-label treatment, often for the symptoms of withdrawal.

### Medications for Opioid Use Disorder

**Methadone** is an opioid agonist, which means it acts by attaching to the opioid receptors in the brain, leaving no room for other opioids. Its effects are mild—it eases pain but with much less of the euphoria associated with heroin or other prescription pain killers like oxycodone—and users are able to function in their daily lives without cravings to "get high" and without going through withdrawal. A person does not have to be in withdrawal from other opioids to begin taking methadone. Methadone is a daily medication, and patients must generally go to a clinic every day to take their dose under clinical supervision, making diversion difficult. (After prolonged successful compliance with treatment, some patients are able to take some doses home). Because methadone is classified by the federal Drug Enforcement Administration DEA as a schedule II controlled substance, with a high potential for abuse, methadone providers must be federally accredited as an opioid treatment program and follow rigorous federal treatment standards. It has been used to treat opioid addiction since 1947 and is widely considered to be safe and effective when administered and taken correctly.

**Buprenorphine** is a partial opioid agonist, which means that it, too, attaches to the receptors in the brain and blocks other opioids, but its pain killing and euphoria effects are weaker than methadone. The effects of buprenorphine also level off at a moderate dose, so even if a person takes more the effects will not increase, which discourages misuse. Buprenorphine requires medically monitored induction because timing is important: A person must already be at least 12 to 24 hours into withdrawal from other opioids because if buprenorphine is started too soon it can trigger abrupt, painful withdrawal. Buprenorphine comes in several forms—pills, film, monthly extended release injection and six month subcutaneous implants. Buprenorphine is classified by the DEA as a schedule III drug, with a moderate to low potential for dependence, but prescribers are still required to complete specialized training and be federally certified. Subutex is a brand name for buprenorphine.

**Suboxone** is the brand name for combined buprenorphine and naloxone, the medication that blocks opioid receptors and stops overdoses. The buprenorphine provides some pain relief while the naloxone blocks any opioid-related euphoria and discourages misuse. Suboxone comes as a film or a pill, both meant to be dissolved under the tongue. If the Suboxone pill is taken correctly, the buprenorphine works as it is supposed to, but if a person crushes the tablets to inject the drug, the naloxone kicks in and can trigger abrupt and painful withdrawal. Like the buprenorphine it contains, Suboxone is classified by the DEA as a schedule III drug, and prescribers are required to complete specialized training and be federally certified.

**Naltrexone** is an opioid antagonist, meaning that it blocks, rather that binds to, the brain's opioid receptors. It has no pain reducing or euphoric effects of its own, and if a person takes an opioid while on naltrexone the drug blocks the expected effects; even though it provides no 'high' of its own, naltrexone has been shown to reduce drug cravings and has little risk of diversion or misuse. Because naltrexone completely blocks the opioid action, a person must have completed initial withdrawal from any opioids, usually seven to 10 days before starting naloxone, to avoid going into immediate withdrawal.
**Naltrexone** is available as a once a day pill or as a monthly extended release injection; the injection is sold under the brand name Vivitrol. Providers are not required to have any special training or certification before prescribing naltrexone.

**Naloxone** is an opioid antagonist that reverses an opioid overdose. It is drawn to the brain's opioid receptors more strongly than heroin or other opioids, and when administered to someone who is having an overdose it removes the opioid from the receptors for a short while. That reverses the overdose and allows the person to resume breathing normally. Depending on the amount of opioids the person has taken, more than one dose may be necessary. Naloxone has no effect on someone who does not have opioids in their system and it has no other positive effect on the brain, so there is no potential for diversion or misuse. Naloxone is also sold under the brand name Narcan.

**Medications for Alcohol Use Disorder**

**Disulfiram** works by changing the way the body metabolizes alcohol and creating an aversive reaction. It breaks the alcohol down into the same toxic chemical that causes hangovers, and then blocks the body from breaking it down further, so that a person keeps feeling sick for a prolonged time. Because of the way it interacts with even a small amount of alcohol, disulfiram cannot be started until at least 12 hours after a person has consumed alcohol. Antabuse is the

brand name for disulfiram.

**Acamprosate** acts in the brain to block the positive feelings of being intoxicated and over time helps to re-stabilize brain chemicals that were damaged by years of alcohol abuse. Research indicates it is most useful as supportive therapy for people who have already stopped drinking. It does not mitigate any of the negative effects of alcohol withdrawal and so people should not start this medication until five to eight days after they stop drinking. Acamprosate comes in a pill that is taken two or three times per day. Campral is the brand name for acamprosate.

**Naltrexone** can also be used for alcohol dependency, where it blocks the positive feeling of being intoxicated and reduces cravings for alcohol. Without an incentive for relapse, some people are able to stay sober and in treatment for longer periods of time, increasing the potential for recovery. Naltrexone is available as a once a day pill or as a monthly extended release injection; the injection is sold under the brand name Vivitrol.

**Benzodiazepines** are anti-anxiety medications that affect the same receptors in the brain that alcohol does. That allows the body to withdraw from alcohol without feeling the full negative effects, and lessens symptoms of alcohol withdrawal like hallucinations or seizures. Because this class of drugs is highly addictive, benzodiazepines are used only until the most severe symptoms of withdrawal pass.

BG/ER/hg/al/ne/al