**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

DISABILITY RIGHTS NEW MEXICO, INC.,

Plaintiff,

v.                                       No. 1:22-CV-00954-WJ-JFR

TAFOYA LUCERO, et al.,

Defendants.

<u>ORDER AND SETTLEMENT AGREEMENT</u>

THIS MATTER comes before the Court by agreement of Defendants Tafoya Lucero and

Asonganyi in their official capacities and the New Mexico Corrections Department ("NMCD")

(Defendants) and Plaintiff Disability Rights New Mexico (collectively "the Parties"). Based

on the stipulation of the Parties, and otherwise being fully informed, the Court finds as follows

pursuant to 18 U.S.C. § 3626(a)(1):

1.  This Order resolves Plaintiff's Complaint, filed with the Court on December 15, 2022 [Doc.

    1].

2.  Plaintiff Disability Rights New Mexico (DRNM) contends that it is a New Mexico agency

    authorized by federal statutes to pursue legal remedies on behalf of persons with

    disabilities. *See* 42 U.S.C. §§ 15001, *et seq.* (2000) (Developmental Disabilities Assistance

    and Bill of Rights Act); 29 U.S.C. § 794e (1994) (Protection and Advocacy of Individual

    Rights); 42 U.S.C. §§ 10801, *et seq.* (1997) (Protection and Advocacy for Mentally Ill

    Individuals Act). DRNM further contends that it has standing to advocate and litigate on

    behalf of individuals with opioid use disorder (OUD) who are receiving medication for

1

opioid use disorder (MOUD) to treat this chronic condition.[1]  The NMCD contends that no

NMCD inmate, in an individual capacity, is a named party in this action.

3.  Defendants Tafoya Lucero and Asonganyi are sued in their capacity as officials with the

NMCD.   The NMCD provides health care services to inmates in custody in NMCD

facilities.   These services include treatment of medical and behavioral health conditions,

and distribution of medications ordered by a licensed health care professional.  *See, e.g.,*

CD-171600 Management of Pharmacies/Pharmaceuticals at Adult Facilities; CD-1070100

Medical   clinical   Services,   Psychiatry   Services,   Detoxification,   Intoxication   and

Withdrawal.

4.  DRNM contends that inmates with OUD, who are receiving MOUD under the supervision

of a qualified, licensed medical provider should receive "continuity" of MOUD treatment

when entering custody of the NMCD pursuant to 42 U.S.C. 1231-12134 as well as recent

guidance issued by the United States Department of Justice, 28 C.F.R. § 35.130(a), and the

United States Constitution.

5.  The New Mexico legislature recently enacted a statute entitled: "Medication-assisted

treatment for the incarcerated program fund."   NMSA 1978, Section § 24-1-5.11(D)(2)

(2023).

6.  This law states that the "corrections department shall . . . by December 31, 2025, establish

and  operate  a  medication-assisted  treatment  program  to  continue  medication-assisted

treatment  for  incarcerated  people  with  a  prescription  who  are  booked  into  a  state

correctional facility."  § 24-1-5.11(D)(2).  In addition, the law prescribes the creation of

---

[1] MOUD generally refers to the three medications approved by the Federal Drug Administration (FDA): methadone, buprenorphine/suboxone, and naltrexone.

regulations to guide the implementation and operation of a medication-assisted program. It also provides for funding mechanisms to achieve these ends.

7. The statute further provides that "[n]o later than December 1, 2023, the human services department [health care authority department] shall promulgate rules for the operation of medication-assisted treatment programs in correctional facilities in consultation with the corrections department, county corrections administrators and providers who specialize in substance use disorder treatment and have experience working in corrections settings." § 24-1-5.11(C).  It is understood that this rulemaking process will require public input and implementation consistent with existing New Mexico law.

8. Additionally, since the initiation of this lawsuit, the federal government has removed some administrative barriers to the provision of buprenorphine/suboxone to address the opioid crisis and provide care for people with OUD.

9.  In light of these events, the Parties have agreed for the NMCD to initiate interim measures to begin developing a pilot program to assist with establishing buprenorphine prescribed treatment regimens, *i.e.,* MOUD, while the Human Services Department promulgates rules for the operation of medically-assisted treatment programs in corrections facilities and the NMCD creates and implements medication assisted treatment programs consistent with State legislative initiative.  The Parties agree that the terms of this agreement are the most efficient manner to resolve this matter.

10. It is in the best interests of the Parties and the public for this Settlement Agreement to be entered at this time, without the expense of further litigation.

11. The Settlement Agreement is proper and all the relief described in the Settlement Agreement:

a.  is narrowly drawn;

b.  extends no further than necessary to correct the alleged violations of the federal rights of Plaintiff's constituents;

c.  is the least intrusive means necessary to correct the alleged violations of the federal rights of Plaintiff's constituents; and

d.  will have no adverse impact on public safety or the operation of the criminal justice system.

It is therefore ORDERED that Defendants and Plaintiff will implement the following Settlement Agreement:

### SETTLEMENT AGREEMENT BETWEEN PLAINTIFF AND DEFENDANTS

1.  In consideration for this Settlement Agreement, Plaintiff agrees to dismissal of the lawsuit as provided below.

2.  Beginning December 30, 2023, the NMCD Contract Vendor Medical Director, the NMCD Medical Director, the Director of Adult Prisons, and any other appropriate staff and designees will review the initial proposed rules from the Human Services Department as provided in § 24-1-5.11(B) and begin promulgating internal medical and institutional policies for a pilot program for prescribed buprenorphine treatment as described in as described in paragraph 6 below.

3.  The internal medical and institutional polices will be implemented within 90 working days following the effective date of the final rules pursuant to § 24-1-5.11(B).

4.  In addition, NMCD staff will evaluate potential funding and other resources reasonable and necessary to facilitate such a pilot program, including ensuring the supply and

availability of buprenorphine.  This includes the one million dollars already appropriated to NMCD from opioid settlement funds.

5. NMCD Staff will also evaluate and determine appropriate facility security, accommodations, inmate classification, housing and staff training to assist with the implementation of the program; NMCD will retain full authority and discretion over such measures, consistent with its oversight authority of NMCD operations and activities.

6. Within 90 working days of the effective date of the final rules in § 24-1-5.11(B), Defendants agree to implement a pilot program to provide buprenorphine treatment regimens for inmates entering the NMCD's custody that are currently receiving MOUD under the supervision of a qualified, licensed medical provider until NMCD fully implements the continuity program under § 24-1-5.11(D)(2).

   a. The pilot program shall be created and overseen by qualified, licensed medical providers in conjunction with the Contract Vendor Regional Medical Director and NMCD Medical Director or their designees and shall conform with all State rules and regulations, including the NMCD medical policies, CD 170000, *et seq*. as well as existing vendor contracts. The program will also comply with any new rules, regulations and policies implemented pursuant to the State statute, § 24-1-5.11(B) & (D)(2) *et seq*.

   b. Within 24 hours of arriving within NMCD custody, inmates will be initially screened for OUD during the Receiving Screen process at CNMCF-RDC and WNMCF-N-RDC.  The screening process will include an inquiry into whether the inmate is currently receiving MOUD under the supervision of a healthcare provider qualified to prescribe such medication.  If so, the screening will include the

5

medication, the provider, the date of last dose, and the amount of last dose.  This information shall be recorded in the medical intake record.  NMCD staff shall have discretion to confirm independently the details of any existing treatment plan by such a provider.

c.  Upon completion of the Receiving Screening, the screener shall notify the on-call medical provider.  The on-call medical provider shall make an independent and timely assessment of the medical need for buprenorphine to be prescribed to such inmates on existing treatment regimens.

d.  The assessment shall be consistent with the current standards of medical care and may take into account any appropriate factors within the judgment of the medical provider, who may consult with appropriate NMCD officials and staff as necessary so long as such consultation comports with medical privacy laws.

e.  Upon the on-call medical provider's approval of the assessment and issuance of a written medical order, medical staff shall create and document within the inmate's plan of care the inmate's MOUD regimen going forward, and the inmate will begin receiving prescribed doses of buprenorphine in a timely manner, consistent with the care plan and appropriate medical standards of care.

f.  Any medical order for MOUD will be based upon informed consent from the inmate pursuant to accepted medical standards of care.

g.  A brief disruption of an existing MOUD prescription due to incarceration and transport to NMCD shall not make an individual ineligible for buprenorphine.

    h.  For the purposes of this pilot program, pregnant and/or lactating women currently receiving buprenorphine under the NMCD program will also be assessed for a treatment regimen once they are no longer pregnant or lactating.

    i.  Defendant agrees to lift any prohibition that prevents individuals under NMCD custody or supervision who reside at GeoGroup's Men's and Women's Recovery and Crossroads Pavilions from being able to receive MOUD to treat OUD pursuant to a medical plan of care under the supervision of a physician or other qualified healthcare provider.

    j.  NMCD and its contract provider will retain supervision and oversight over the pilot program during its duration.

    k.  This agreement and the pilot program will not preclude or otherwise affect the NMCD's ongoing efforts to implement the State statute, § 24-1-5.11(B) and (D)(2) *et seq.*, including other existing or potential pilot programs for medication assisted treatment.  To the extent the provisions of this agreement conflict with the final rules under § 24-1-5.11(B), the State rules shall control.

7. Once the pilot progam is initiated, Defendant will provide Plaintiff a quarterly report indicating:

    a.  the number of inmates screened the preceding quarter who reported MOUD treatment under the supervision of a qualified healthcare provider;

    b.  the number of inmates initiating MOUD continuity treatment under a plan of care in the pilot program in the preceding quarter while in NMCD custody;

    c.  the total number of inmates receiving MOUD treatment under a plan of care in the pilot program during the preceding quarter;

d.  the data shall be provided in an aggregated form, with any appropriate measures to protect patient confidentiality and protected health information under HIPAA.

8.  This agreement and pilot program will terminate on December 31, 2025.

9.  This agreement is enforceable only by the Parties.  No person or entity is intended to be a third-party beneficiary of this agreement for the purpose of any civil, criminal, or administrative action.  Accordingly, no person or entity may assert any claim or right of as a beneficiary of this Agreement.

10. Although the Parties agreed that this Court could retain jurisdiction to enforce this agreement as an order of the Court until it terminates under paragraph 8 of this settlement agreement, the Court declines to retain jurisdiction until the agreement terminates under paragraph 8.  The Court will, instead, order that Plaintiff shall have 30 days from the Court's filing of this Settlement Agreement to file a petition with this Court for attorney's fees and litigation expenses. The Court shall retain jurisdiction of the case until the fee petition is addressed and shall enter an order dismissing this matter once that is resolved. Further, the Court grants the parties leave until the termination of this agreement on December 31, 2025 to file a motion to reopen the matter to enforce the terms of the settlement agreement as provided in paragraph 8 of this settlement agreement.

11. Plaintiff reserves its rights to seek its reasonable attorneys fees and costs.

12. The Court shall enter an order dismissing this matter but granting the parties leave until the termination of this agreement on December 31, 2025 to file a motion to reopen the matter to enforce the terms of the settlement agreement as provided in paragraph 8 of this settlement agreement.

IT IS SO ORDERED.

8

WILLIAM P. JOHNSON
CHIEF UNITED STATES DISTRICT JUDGE